# Richmond

R. A. POFF & COMPANY, INCORPORATED V. JAMES E.
OTTAWAY AND JACQUELINE L. OTTAWAY.

January 15, 1951.

Record No. 3707.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*S. King Funkhouser* and *T. Keister Greer*, for the plaintiff in error.

*Walter H. Scott*, for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

This is an action at law to recover a brokerage commission which R. A. Poff & Company, Inc., claimed it had earned in effecting the sale of a residence owned by James E. Ottaway and Jacqueline L. Ottaway, his wife. There was a trial by jury which resulted in a verdict for the defendants, and to review the judgment entered on that verdict the present writ has been allowed.

R. A. Poff & Company, Inc., is a real estate brokerage concern operating in the city of Roanoke. In the summer of 1948, George P. Washburn, one of its representatives, noted from a newspaper advertisement that the Ottaways

had for sale a house and lot located at 1246 Summitt avenue in Roanoke. Washburn visited the Ottaway home and secured from Mrs. Ottaway a non-exclusive listing of the property for sale at the price of $12,000. No buyer was procured at that price and in the late fall the Ottaways withdrew the property from sale. In January, 1949, the property was again put up for sale at the reduced price of $11,000.

On January 5th Washburn showed the Ottaway house to W. D. Allen and his wife. At that time Mrs. Ottaway told Washburn that if he could secure an offer of $10,750, she thought it would be acceptable. The following day the Allens notified Washburn that they wished to buy and a contract was prepared and signed whereby the Ottaways agreed to sell the property to W. D. Allen, and he in turn agreed to buy, at the sum of $10,750 cash. The contract also provided that Allen was to make an initial payment of $250, and that the transaction would be closed within sixty days. A broker's commission of $450, to be paid by the Ottaways to Poff & Company, Inc., was agreed on.

R. A. Poff, the president of the brokerage concern, and Washburn first presented the contract to Allen for his signature. Allen says that before signing the contract he told both Poff and Washburn that he did not have the necessary funds to consummate the purchase unless and until he had sold his own house on Williamson road. He further said that Poff assured him that he would have no difficulty in selling the Allen house and accordingly suggested that sixty days be allowed for consummating the purchase of the Ottaway property in order that the Allen house might be sold in the meantime.

Furthermore, Allen testified, he and Washburn were quite intimate socially and Washburn knew that he (Allen) did not have sufficient means to consummate the purchase of the Ottaway property until his (Allen's) house had been sold.

Both Poff and Washburn denied that Allen made any

such statement to them, or either of them, that his (Allen's) ability to consummate the Ottaway deal was conditioned upon the sale of the Allen house. Washburn admitted that he knew that Allen had only a small equity of around $500 in his house, but other than that, he said, he knew nothing of Allen's financial condition.

After Allen had signed the contract, Poff and Washburn called upon Mrs. Ottaway for the purpose of procuring her signature. Mrs. Ottaway testified that neither she nor her husband knew the Allens, but that Poff told her that the Allens "were very well off financially," and that during the conversation Poff left her "with the impression" that Allen had $5,000 in cash.

Mrs. Ottaway says that in the presence of Poff and Washburn she then called her husband over the telephone and told him that she had signed the contract because of these representations.

After Mrs. Ottaway had signed the contract Poff and Washburn called upon Ottaway at his place of business. Ottaway testified that, "Mr. Poff told me Mr. Allen was financially able to take care of his obligations; that he was in business in Roanoke and he knew him and he could take care of the cash balance." Upon the basis of these representations, Ottaway said, he signed the contract.

Again both Poff and Washburn denied that any representations or statements whatsoever were made by either of them to Ottaway or Mrs. Ottaway with respect to Allen's financial situation. They also denied having heard Mrs. Ottaway telephone her husband as to the representations which she said they had made to her.

After the contract had been signed, Allen listed his house for sale with R. A. Poff & Company, Inc., and other brokers for $10,750, the same price which he had agreed to pay for the Ottaway property.

Allen failed to consummate the purchase of the Ottaway property within the sixty days specified in the contract. Early in March, Ottaway tendered him a deed and Allen refused to accept it, claiming that he was not financially

able to go through with the transaction. Ottaway reported this situation to Poff who suggested that Ottaway bring suit to compel Allen to comply with the contract. Ottaway consulted Walter H. Scott, a member of the local bar, and at the latter's instance Allen was called into conference.

On March 9, upon Scott's advice, Ottaway wrote Poff & Company, Inc., revoking its authority to sell the property, "due to the fact that he (Allen) did not have the cash to pay for the same, which you represented to me that he had at the time you procured my signature upon the contract of sale." In this letter Ottaway also informed the broker that he did not intend to pay the agreed commission.

On March 11, the Ottaways and Allen executed a new contract with respect to the sale and purchase of the property. The contract itself was not admitted in evidence, but oral testimony was admitted as to its provisions.[1]

The evidence is not entirely clear as to the detailed provisions of the contract, but the briefs on both sides seem to concede that by its terms Allen was to pay, and did pay, $1,000 in cash, was to assume two mortgages on the Ottaway property for $6,800 and $2,500, respectively, and was to give a note or cash for the balance upon the closing of the transaction.

Under the further provisions of the contract Allen was to endeavor to sell his house and refinance, if possible, the two mortgages on the Ottaway house which he (Allen) had agreed to assume. Fortunately, Allen was successful in both of these undertakings. He sold his own house for the sum of $9,100 net, which after the payment of the mortgage thereon left a small balance in his hands. He refinanced the two mortgages on the Ottaway property and

[1] Counsel for Poff & Company, Inc., objected to the introduction of this contract in evidence, on the grounds that (1) it had been merged in the subsequent deed whereby the Ottaways had conveyed the property to Allen, and (2) it contained certain "self-serving declarations" favorable to the defendants. The court overruled the plaintiff's first objection, but excluded the contract under the second. It permitted evidence as to the provisions of the contract, exclusive of the objectionable "self-serving declarations."

from these two transactions raised a sufficient amount to pay the balance due on the agreed price of $10,750, the sum stipulated in the contract of March 11. By deed dated May 23, 1949, the Ottaways conveyed the property to Allen for a recited consideration of $10,750 cash, and the transaction was closed shortly after June 1.

More than two months before the transaction was closed, namely, on March 24, Poff & Company, Inc., brought the present suit to recover the broker's fee alleged to be due it.

The plaintiff broker says that since its undertaking was to procure a purchaser who was ready, willing and able to buy the property on the vendors' terms, that undertaking was fulfilled and it was entitled to its reward when the vendors accepted the purchaser and entered into a valid and enforceable contract with him.

But this is only a partial statement of the rule, for it is well settled that in such circumstances the vendor's acceptance of the purchaser and entering into a contract with him must not have been induced through the broker's misrepresentation as to the purchaser's financial situation, or by the broker's withholding from the vendor any material information which he (the broker) may have had on the subject. *Kingsland Land Corp.* v. *Lange, ante,* pp. 256, 261, 262, 60 S. E. (2d) 872, 874, 875; *Parker* v. *West, ante,* p. 710, 62 S. E. (2d) 862.

Because of the confidential relationship between them, it is the broker's duty to deal with the vendor in utmost good faith, and to give him fully and frankly such information as he (the broker) may have of the prospective purchaser's financial situation. *Mitchell* v. *Hughes,* 143 Va. 393, 404, 130 S. E. 225; *Kingsland Land Corp.* v. *Lange, supra* (*ante* at page 262, 60 S. E. (2d) at page 875).

In the light of the jury's verdict the present case comes squarely within these principles. The verdict has settled the disputed fact that Allen told the broker's representatives that he could not pay for the property unless and until his (Allen's) house was sold, and that this information was not disclosed to the Ottaways before they executed the

contract. That the withholding of this information from the Ottaways was a material factor is apparent. The Ottaways say that they would not have executed the contract with Allen if they had known this.

The verdict has also settled the disputed question of fact that Poff and Washburn made the representations to the Ottaways, which the latter say they did, as to Allen's financial ability to perform the contract and pay cash for the property, and that such representations induced the Ottaways to sign the contract.

█ Whether these representations as to Allen's financial ability were true as of the date of the execution of the contract on January 6, 1949, which the plaintiff concedes is the material date, was a question of fact for the jury.

There is ample evidence to support the finding that Allen was not financially able to pay the required sum of $10,750 in cash for the property on the date in question. As Allen testified, his ability to consummate the transaction depended upon the sale of his own house, which was not accomplished until the latter part of May. Moreover, a material factor in Allen's consummation of the purchase was his ability to refinance the mortgages on the property. There is no evidence whatsoever that this could have been accomplished in January.

While there is evidence that Allen was conducting a successful business as the operator of a beauty parlor, he had little available cash. There is no evidence that he had sufficient credit to borrow any considerable amount of money. Indeed, it was with considerable difficulty that he was able to raise $1,000 in cash which he paid the Ottaways upon the execution of the new contract on March 11. There is no evidence that he could have raised even this amount on January 6, the date the first contract was signed.

The plaintiff broker next contends that the Ottaways have waived the alleged fraud by consummating the contract with Allen after full knowledge of the facts.

█ It is, of course, true that one who with full knowledge of the facts accepts the benefits of and performs a con-

tract to which he says his assent has been induced by misrepresentation or fraud, thereby waives the fraud complained of. *West End Real Estate Co.* v. *Claiborne,* 97 Va. 734, 752, 34 S. E. 900; *Pretlow* v. *Pretlow,* 177 Va. 524, 549, 550, 14 S. E. (2d) 381, 387. For the application of the principle to brokers' contracts, see 12 C. J. S., Brokers, section 69-c, p. 161; 8 Am. Jur., Brokers, sec. 102, pp. 1044, 1045.

The answer to this contention is that the Ottaways did not consummate the contract of January 6, procured by the broker. On the contrary, after having discovered that they had been induced to sign the contract through the misrepresentations of the broker's representatives, or by their withholding material information from them, the Ottaways, by their letter of March 9, promptly disaffirmed the contract and revoked the broker's authority to sell the property, as they clearly had the right to do. Thereafter the Ottaways and Allen entered into an entirely new contract, under date of March 11, for the sale and purchase of the property. As has been pointed out, under the terms of the new contract, Allen, the purchaser, was not required to pay cash for the property, as called for in the first contract. He was to pay only $1,000 in cash, was to assume mortgages amounting to $9,300, and was to give a note for the balance if he was unable to raise the remaining cash at the time of the settlement. The broker's representatives had no part in the negotiation of this contract. They were given the opportunity of undertaking to arrange a new contract with Allen which he might be able to perform, and declined to do so. In other words, the efforts of the parties themselves were the final procuring cause of the sale of the property.

It is entirely beside the point that the parties eventually worked out their complicated affairs by a sale of Allen's house and a refinancing of the loan on the Ottaway property, with the result that the Ottaways received the full purchase price of the property in cash. This was done in good faith and there is no evidence whatsoever that its

purpose was to circumvent the payment of the broker's commission. See *Clarke* v. *Cosby*, 154 Va. 267, 275, 153 S. E. 727.

Error is assigned to the action of the lower court in allowing the defendants to prove the provisions of the new contract entered into between the parties on March 11. The argument is that this contract was merged in the deed of May 23, which showed that the property had been sold for $10,750 cash, and that the parol evidence rule forbade the introduction of evidence of the contract, which showed that the property had been sold on different terms.

■ It is well settled that the parol evidence rule which makes a written instrument conclusive proof of what the parties have agreed to, thus merging in it all prior negotiations, applies only to a controversy between the parties to the instrument. It does not apply to a controversy between third parties, or to a controversy between a third party and one of the parties to the instrument. This is so because the stranger, not being a party to the instrument, is not bound thereby and is free to vary or contradict it, and consequently his adversary must be equally free to do so. See *Harriss, etc., Co.* v. *Rodgers & Co.*, 143 Va. 815, 831, 832, 129 S. E. 513, for a discussion of the subject. See also, Greenleaf on Evidence, 16th Ed., sec. 279, p. 407; 32 C. J. S., Evidence, sec. 861, p. 791 *ff*.

■ In the present controversy, inasmuch as the plaintiff broker was not a party to the deed in question, the parol evidence rule may not be invoked by or against it to exclude the evidence of the provisions of the contract of March 11.

Complaint is made of the refusal of the lower court to grant plaintiff's Instruction No. 8, which in substance told the jury that if they believed from the evidence that the broker had procured Allen as a purchaser for the property and that a valid contract was entered into between Allen and the Ottaways, "then whether the said Allen was ready, willing and able to go through with such contract can no

longer be questioned, for the Ottaways' execution of the contract operates as an acceptance of the purchaser."

The court refused to grant this instruction because, as it correctly pointed out, the important qualification, which we have discussed, that the contract must not have been procured through the misrepresentation or misconduct of the broker, was omitted.

On the whole we find no error in the record and the judgment complained of is

*Affirmed.*