## Richmond

### FLOYD S. PIKE ELECTRICAL CONTRACTOR, INC.

### v.

### COMMISSIONER, DEPARTMENT OF LABOR AND INDUSTRY, ETC.

September 11, 1981.

Record No. 800050.

Present: Harrison, Poff, Thompson, JJ., and Harman, S.J.

318

*James P. Jones (Penn, Stuart, Eskridge & Jones,* on briefs), for appellant.

*Leonard Vance, Assistant Attorney General (Marshall Coleman, Attorney General; Walter H. Ryland, Chief Deputy Attorney General,* on brief), for appellee.

## PER CURIAM.

The issue on appeal is whether the trial court erred in concluding that an employer violated work safety regulations adopted by the Virginia Safety and Health Codes Commission.

Floyd S. Pike Electrical Contractor, Inc. (Pike), was engaged by an electrical power company to install a transmission line to the power company's substation near Grundy. The job required Roger Hubbard, one of Pike's foremen, and his crew to pull lines down a mountain and across a highway to the substation. One non-energized line (hereinafter, "the cold wire") was attached to a catch-off pole (a temporary pole used to secure the end of a transmission line), located near the substation but not directly beneath a 69,000-volt energized line ("the 69-KV wire"). The cold wire, however, ran approximately 12 feet 3 inches beneath the 69-KV wire to the top of the mountain. An 88,000-volt energized line ("the 89-KV wire") ran parallel to the 69-KV wire approximately 60-90 feet to the left side of the 69-KV wire. While lifting the

cold wire above a bridge on the highway so that a truck could pass, one worker was killed and another injured when the cold wire whiplashed[1] and struck the 69-KV wire.

The Commissioner of the Department of Labor and Industry issued a citation charging Pike with "serious"[2] violations of safety regulations[3] promulgated under the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 *et seq.,* and adopted by the Virginia Safety and Health Codes Commission. *See* Code §§ 40.1-22, -49.4. The general district court heard evidence and dismissed the citation, and the Commissioner appealed to the circuit court.

In the circuit court trial, there were significant conflicts between the evidence adduced by the Commissioner and that adduced by Pike, the most critical of which concerned conversations between Hubbard and Leo Sams, Pike's area supervisor and Hubbard's superior, regarding placement of the catch-off pole. Hubbard testified that he told Sams the pole was in the best possible position and that Sams said nothing in reply. On the other hand, Sams testified that approximately one month before the accident he and Hubbard discussed moving the pole 20 to 30 feet to the left so that the line between the catch-off pole and the top of the mountain would not be dangerously close to the 69-KV line. According to Sams, he talked with Hubbard by radio on the Friday preceding the Monday accident and asked if the catch-off pole had been moved. Sams said Hubbard told him, "I'll move it this evening or in the morning one." Sams acknowledged he did not order Hubbard to move the pole. Sams' account of the radio conversation was confirmed by Ronald Gilbert, who testified he heard it on a receiver in his truck.

---

[1] No one knew what caused the wire to whiplash. Hubbard surmised, however, that the wire became entangled in brush and popped loose when pulled.

[2] Code § 40.1-49.3(5) defines as "serious" a violation entailing "a substantial probability that death or serious physical harm could result" from a condition or practice which exists "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." Serious violations result in a civil penalty of up to $1,000. Code § 40.1-49.4(H).

[3] Specifically, Pike was cited for violating Regulation § 1926.955(c)(3), which requires that "the conductor being installed or removed . . . be grounded or provisions made to insulate or isolate the employee" and for violating Regulation § 1926.955(c)(5), which requires that "[c]onductors being strung in . . . be kept under positive control by the use of adequate tension reels, guard structures, tielines or other means to prevent accidental contact with energized circuits." 29 C.F.R. § 1926.955(c)(3) and (c)(5).

A second important conflict in the testimony concerned whether moving the catch-off pole 20 to 30 feet to the left of the 69-KV wire, as Sams reportedly urged, would have made the working conditions safe. According to both Hubbard and A. L. McAlexander, Safety Director for Pike, if the pole had been so moved, the cold wire between the catch-off pole and the top of the mountain, approximately 2,000 feet long, would not have been directly under the 69-KV wire. Hubbard testified, however, that if the catch-off pole had been moved to the suggested location, the cold wire between the catch-off pole and the substation, approximately 100 feet, would have traveled beneath the 69-KV wire. Placing the catch-off pole approximately 30 feet to the left, moreover, would have positioned the cold wire midway between the 69-KV and 88-KV wires. McAlexander testified that if the catch-off pole had been moved, "there is no way . . . this accident could have occurred in the manner it did." Pressed on cross-examination to state whether the proposed location between the 69-KV and 88-KV wire would have been safe, McAlexander stated that when power lines whiplash, "it's usually an up and down motion rather than a side to side." On the other hand, Eugene Roberts, the Safety Representative for the Virginia Department of Labor and Industry, testified he did not think the catch-off pole "could have been moved to where it would . . . not [have] been exposed to other energized lines."

A third area of dispute was whether Pike should have employed other safety measures in addition to, or in lieu of, moving the catch-off pole. Several devices for insuring that a transmission line does not rise above a desired height (tie-downs, tension reels, and hold-down blocks) could have been used to prevent the accident but were not. McAlexander described use of these devices as less attractive alternatives because of the possibility of malfunction. Apart from these alternatives, Roberts testified the accident could have been avoided if the two workers had used a bucket truck in lifting the cold wire. Sams stated, however, that the workers could not have used a bucket truck at this site.

In his letter opinion, the trial judge noted the conflict between the testimony of Hubbard and Sams concerning the conversations regarding the placement of the catch-off pole, but did not resolve which account was accurate. The judge also stated he was "not satisfied" that moving the catch-off pole "would have . . . prevented this accident from taking place." We interpret the trial

judge's statement as a factual finding that moving the catch-off pole would not have removed the danger of contact between the cold wire and energized lines. Finally, the trial judge concluded that if Pike had used alternative safety procedures, "this accident could have been prevented."

█ On appeal, findings of fact made by the trial judge are presumed to be correct and are "given the same effect as a jury verdict, settling all conflicts in the evidence in favor of the prevailing party." *Richmond* v. *Beltway Properties,* 217 Va. 376, 379, 228 S.E.2d 569, 572 (1976). In reviewing such a factual finding, we view the evidence in a light most favorable to the finding. *See, e.g., Rudder* v. *Housing Authority,* 219 Va. 592, 595, 249 S.E.2d 177, 178 (1978), *appeal dismissed,* 441 U.S. 939 (1979). A contention that the evidence does not support the court's factual finding will be sustained only when the finding is plainly wrong or is without credible evidence to support it.

█ In light of the deference due a trial court's factual findings, we conclude that the evidence supports the trial court's judgment. The evidence, viewed in a light most favorable to the findings, adequately supports the trial court's conclusion that moving the catch-off pole would not have removed the danger of contact between the cold wire and energized lines. Hubbard testified that the proposed location for the catch-off pole would have caused a portion of the cold wire to be suspended beneath the 69-KV wire. Roberts, moreover, said that he did not think the catch-off pole "could have been moved to where it would . . . not [have] been exposed to other energized lines." Upon this testimony, the trial court reasonably could conclude that moving the catch-off pole would not have removed the danger of contact between the cold wire and energized lines. Similarly, the evidence supports the trial court's factual finding that the use of tielines, tension reels, holddown blocks, or similar devices would have prevented the accident.

█ The safety regulations at issue here were not designed to make the employer an insurer of an employee's safety. *Ocean Elec. Corp.* v. *Secretary of Labor,* 594 F.2d 396, 399 (4th Cir. 1979); *Brennan* v. *Butler Lime and Cement Company,* 520 F.2d 1011, 1017 (7th Cir. 1975). A safe workplace is not necessarily risk-free. *Industrial Union Dept.* v. *American Petrol. Inst.,* 448 U.S. 607, 647 (1980) (plurality opinion). "An employer . . . need not take steps to prevent hazards which are not generally foreseeable, including idiosyncratic behavior of an employee, but at the

same time an employer must do all it feasibly can to prevent foreseeable hazards. . . ." *General Dynamics* v. *Occupational Safety & Health,* 599 F.2d 453, 458 (1st Cir. 1979). The trial court's judgment, however, does not impose civil liability for the idiosyncratic, unforeseeable behavior of an employee. Instead, the trial court held that Pike chose a measure (moving the catch-off pole) that would not have removed the danger to its employees and chose to disregard other safety measures that would have prevented the accident.

In light of the evidence presented, we hold that the trial court's findings were adequately supported by the evidence and merited the imposition of a civil penalty against Pike, and the judgment will be affirmed.

*Affirmed.*