### Richmond

ANNE B. McCOMB

v.

## J. C. McCOMB, II

October 14, 1983.

Record No. 810518.

Present: All the Justices.

*Harry P. Anderson, Jr. (Anderson and Parkerson*, on brief), for appellant.

*James M. Minor, Jr. (Minor & Lemons, P.C.,* on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal focuses upon the parol evidence rule and the law of contribution. Here, Anne McComb's parents lent $4,000 to be used as a down payment on a house purchased jointly by Anne and her then husband J. C. McComb, II. J. C. gave a note to Anne's parents which was signed solely by him. In the note he described the $4,000 as money lent to him. After the house was purchased, the McCombs' marriage failed. Prior to a divorce, J. C. repaid the $4,000. While divorce proceedings were pending, Anne sued J. C., in general district court, on a certain I.O.U. in the amount of $5,000. In response to Anne's suit, J. C. filed a counterclaim in which he contended that Anne was jointly liable with him for the $4,000 loan from Anne's parents. J. C. demanded a set-off of $2,000 against any judgment Anne might secure against him. The general district court entered judgment in favor of Anne on her claim of $5,000 but granted J. C. 's counterclaim and ordered a set-off of $2,000 against the $5,000 judgment.

Anne appealed the district court's decision to the circuit court.[1] There she challenged the district court's determination that she was a joint obligor on the $4,000 loan from her parents and was thus bound to contribute to the payment made by J. C.

The issue was re-tried before the circuit court. The court heard the testimony of J. C., Anne, and Anne's father, Mr. Blankenship. In addition, the court considered the exhibits filed by the parties and the argument of counsel. The circuit court reached the same conclusion reached by the general district court: that J. C. was entitled to a set-off of $2,000 against the judgment secured against him by Anne because Anne was jointly obligated to repay the $4,000 loan from her parents. Anne appealed to this Court. We think the trial court was correct and we will affirm its decision.

---

[1] J. C.'s counsel represented to the circuit court that his client had attempted to appeal the general district court's ruling on the $5,000 I.O.U. but had not been successful in doing so because the appeal "was not perfected." Thus, the only part of the case to reach the circuit court concerned the set-off.

On this appeal Anne makes two assignments of error. She first contends that the trial court "erred in admitting parol evidence . . . that the obligation evidenced by the note [signed by J.C.] was not the sole obligation of" J. C. Next, she contends that the trial court "erred in requiring contribution [from her] on a note which was the sole obligation of" J. C. We will consider these matters in the order presented by appellant.

The first assignment of error concerns a question of law which can be resolved without a detailed consideration of the facts. We have stated the parol evidence rule as follows:

> [P]arol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional written instrument.

*Godwin* v. *Kerns*, 178 Va. 447, 451, 17 S.E.2d 410, 412 (1941); *Walker & Laberge Co.* v. *Bank*, 206 Va. 683, 689, 146 S.E.2d 239, 243 (1966). In this case, the note which Anne contends cannot be varied by parol evidence reads as follows:

> I J. C. McComb promise to pay on demand to Bernard or Mary Margaret Blankenship the four thousand dollars ($4,000.00) lent to me in August 1977. This to be taken care of within two (2) weeks of the request or as soon as the money can be borrowed from a lending bank if this is the case.
> [Signed] J. C. McComb II DDS

Anne points to the parol evidence rule and to the note, then argues that J. C. should not be allowed, after having executed the note, to come into court and attempt to prove something entirely different from what is contained in the note. Anne's argument has some surface appeal because it quite rightly points out that J. C. is being allowed, in effect, to "talk out of both sides of his mouth." On the one hand he signs a writing that the $4,000 was lent to him while on the other hand he says the $4,000 was lent to both Anne and him as joint obligors. Yet, as inconsistent as J. C.'s positions may be, the parol evidence rule is no bar to what he has done.

This Court has consistently held, over the years, that the parol evidence rule operates only between the parties to a writing

and has no application in a suit involving strangers to the writing nor in a suit involving one party to the writing and a stranger thereto. *Poff & Co.* v. *Ottaway*, 191 Va. 779, 62 S.E.2d 865 (1951); *Harriss, Magill Co.* v. *Rodgers Co.*, 143 Va. 815, 129 S.E. 513 (1925); *Roselle* v. *Commonwealth*, 110 Va. 235, 65 S.E. 526 (1909), *aff'd*, 223 U. S. 716 (1912); *Bruce* v. *The John L. Roper Lumber Co.*, 87 Va. 381, 13 S.E. 153 (1891). In *Poff & Co.* we stated the principle and the rationale that undergirds it:

> It is well settled that the parol evidence rule which makes a written instrument conclusive proof of what the parties have agreed to, thus merging in it all prior negotiations, applies only to a controversy between the parties to the instrument. *It does not apply to a controversy between third parties, or to a controversy between a third party and one of the parties to the instrument. This is so because the stranger, not being a party to the instrument, is not bound thereby and is free to vary or contradict it, and consequently his adversary must be equally free to do so.*

191 Va. at 788, 62 S.E.2d at 870 (citations omitted) (emphasis added). A more detailed statement of the rationale supporting the rule is found in *Roselle*. There, we wrote as follows:

> [T]he general rule of evidence here invoked is not of universal application, and . . . it only applies to controversies between parties to the contract or instrument which is the subject matter of the controversy and their privies. It does not apply to controversies between parties to the writing and third persons. . . .
>
> . . . .
> . . . "*The rule under consideration is applied only (in suits) between the parties to the instrument; as they alone are to blame if the writing contains what was not intended, or omits that which it should have contained. It cannot affect third persons, who, if it were otherwise might be prejudiced by things recited in the writings, contrary to the truth, through the ignorance, carelessness or fraud of the parties; and who, therefore, ought not to be precluded from proving the truth, however contradictory to the written statements of others.*"

110 Va. at 237, 65 S.E. at 527 (citations omitted) (emphasis added) (quoting 1 S. Greenleaf, *A Treatise on the Law of Evidence* § 279 (16th ed. 1899)). Here, because Anne was not a party to the note she cannot be bound by the note. She is free to contradict what is set forth therein. And because she is free to contradict the note, J. C. has the same freedom.

We hold, therefore, with regard to the first assignment of error, that since the suit between Anne and J. C. did not involve parties to the note, J. C. was entitled, despite the existence of the note, to prove the true nature of the transaction involving Anne, Anne's parents, and J. C. even if by so doing he completely contradicted everything contained in the note. The parol evidence issue, then, was correctly decided by the trial court.

■ We turn now to the second assignment of error which concerns whether J. C. proved a joint obligation and whether he was entitled to contribution from Anne. The trial court stated that whether a joint obligation existed was a question of the intent of the parties as determined from all the evidence. Since the lower court found that J. C. had proved a joint obligation the question on appeal is whether there is any credible evidence to support that finding. *Pike* v. *Dept. of Labor & Indus.*, 222 Va. 317, 322, 281 S.E.2d 804, 807 (1981). Moreover, since J. C. prevailed below we are required to consider the evidence and the reasonable inferences arising therefrom in the light most favorable to him. *Id.*

J. C. sought to prove that despite the existence of the note, the true circumstances were that Anne's parents made a loan of $4,000 jointly to J. C. and Anne. In that regard he called Anne as an adverse witness. She testified as follows: She admitted that in the summer of 1977 she and J. C. looked at a house located on West Seminary Avenue in Richmond, with the hopes that they could buy the house. She also admitted that at the time she and J. C. looked at the house they did not have enough money to buy it. She denied going to her parents with J. C. to ask their help in buying the house. But she admitted that she "told them the situation." When asked to explain what she meant by "the situation" she responded, "*We* had to move out of the M.C.V. apartments. *We* had to have somewhere to live." (Emphasis added.) Upon further questioning, Anne admitted telling her parents that she and J. C. had seen a home that they wanted to buy. She also testified that her parents knew that she and J. C. did not have the money to buy the house.

On several occasions, when asked directly to whom the loan had been made, Anne said "to J. C." Yet, in response to a question whether her parents had $4,000 to lend she replied as follows: "I think when *they* gave *us* the four thousand dollars it was a real struggle for my father to get it up." (Emphasis added.) J. C.'s counsel then asked her about the use of the word "us." Anne then reverted to the general theme of her testimony and said, "J. C. was responsible." But J. C.'s counsel persisted:

Q. Didn't you just say that your parents gave us the four thousand dollars?
A. *We* bought the house.

(Emphasis added.) Thereafter Anne testified that "When *we* were going to buy the house, J. C. went to my parents and told them that *we* needed four thousand dollars extra to assume a loan." (Emphasis added.)

Next, J. C.'s counsel asked Anne the following question which goes to the core of the case: "The money was obtained by your parents and was given to the two of you to buy this house, was it not?" Anne first said that she didn't know what counsel meant by his question. The question was re-read to Anne, then she answered as follows: "The *two of us* bought the house with the money that *we* got together, yes." (Emphasis added.)

In another series of questions, Anne was asked about the $4,000 check, who received it, to whom it was made out, where it was deposited, and for what it was used:

Q. Did you ever see the check or the money that came from your parents, the four thousand dollars?
A. I was probably the one that put it in the bank, but I don't remember.

She testified that the check came from her parents but gave a non-responsive answer when asked whether the check was given to her. She said she did not remember what kind of check it was nor to whom it was made payable. When asked whether she endorsed the check she responded as follows: "I don't remember. I'm sure I would have—I don't know whether I did or not." She was asked again whether she "got the check." She replied, "[o]ne of the two of us did. I don't know which one did." She admitted that the

$4,000 was used to buy the house in the joint names of Anne and J. C. McComb.

Anne's father, Bernard Blankenship, was also called by J. C. as an adverse witness. Mr. Bankenship admitted that his daughter apprised him and his wife of the fact that Anne and J. C. were interested in buying a house. He also admitted knowing that Anne and J. C. did not have "a whole lot of money because" J. C. had recently finished dental school. He further admitted knowing that Anne and J. C. had been living in the M.C.V. apartments and that they had to move out since J. C. was no longer a student. Next, the following exchange occurred:

Q. You and your wife offered to *help them* buy this house, did you not?
A. Yes, sir.
Q. You gave the two of them four thousand dollars, did you not?
A. I gave J. C. four thousand dollars.
Q. You offered to help both of them, but you gave the money to J. C.
A. But J. C. came to my home and asked me for the money.
Q. But you offered to help the two of them to buy the house, did you not?
A. Well, that is what *they* were telling me that *they* were going to use the money for.
Q. You understood that is what they were going to do with the money.
A. As far as I knew, yes, sir.
Q. You understood that your daughter and her husband were looking for a place to live, and you wanted, *you and your wife wanted to help them* to get a place to live, did you not.
A. Yes, sir.

(Emphasis added.)

In response to another question Mr. Blankenship said that as far as he could remember the check for $4,000 was payable to J. C. He said this was done because J. C. was the one who asked and was "the man of the house."

Mr. Blankenship first denied that his daughter joined in asking for a loan. Then the following exchange took place:

Q. She [Anne] never said a thing to you about letting them
 have the money?
A. Oh, we had talked together about letting them have the
 money. She didn't come to us and actually ask us to let
 them have the money.
Q. Your daughter expected you and your wife to help her
 and her husband to buy the house, did she not?
A. *Yes I told you that.*

(Emphasis added.)

On another subject, Mr. Blankenship admitted knowing that
the house being purchased by his daughter Anne and J. C. would
be bought together by both of them and that both would hold title
to it. He was asked again whether his daughter ever asked for the
money. First he answered this way: "I don't recollect. I'm telling
you, you're asking me, I'm telling you." The question was re-
peated then he said: "Not that I recollect. She didn't ask me."
He was then asked whether his daughter was present the first time
J. C. asked for a loan. He replied as follows: "I don't — I really
don't recall that. I don't believe she was." He was more definite in
stating that Anne was not present when the note was signed.

J. C. McComb's testimony is in direct conflict with portions of
the testimony of Anne and her father. It is consistent with other
portions of their testimony. According to J. C., he and Anne be-
came interested in a house on West Seminary Avenue but did not
have enough money to purchase it. He said they saw the house on
a Sunday and went directly to Anne's parents' home to ask for
their help in purchasing the house. J. C. said that both he and
Anne "discussed with her parents the prospective purchase of this
house." He said that both he and Anne asked her parents to lend
them "some money to buy this house." J. C. said that Anne's par-
ents agreed to help them. J. C. said that after the initial discus-
sion on Sunday he heard Anne on numerous occasions talking to
her mother on the telephone "trying to figure out how much
money that we could borrow from them."

J. C. also said that he never saw the $4,000. He said he never
knew whether the money was in cash or check or if it was a check
to whom the check was made payable. He said, "I just know the
money ended up in our joint savings account, in the joint savings
account."

J. C. said the note was written at the insistence of his wife with the help of her mother. He said Anne wanted this done because "she was upset because all the help came from her side of the family." He said Anne told him what to write down and that the words contained in the note were her words, not his. He said Anne's mother also participated in telling him what to write down.

J. C. also testified that the Blankenships specifically agreed to lend him and Anne the $4,000 and that he heard Anne, in his presence, ask her parents to lend them the money to buy the house.

On another point, J. C. said that the money was not given in exchange for the note. He said that when he delivered the note, no funds were advanced, and he did not even know that the money was in his joint account until the closing.

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to J. C., we are bound to conclude the following: J. C. and Anne lived in apartments at M.C.V. but were required to move out because J. C. had completed dental school. However, Anne and J. C. did not have any money with which to purchase a home. Anne's parents were aware of both the foregoing facts.

One Sunday, Anne and J. C. saw a house on West Seminary Avenue in Richmond that was for sale and which they wanted to purchase. Together they went immediately to visit Anne's parents. Both Anne and J. C. discussed the house with Anne's parents and both Anne and J. C. asked for their help in purchasing the house. Anne's parents agreed to lend money to Anne and J. C., together, to help them purchase the house.

Anne's parents secured the $4,000 requested by Anne and J. C. The money was given directly to Anne in the form of a check which she deposited in the joint savings account she maintained with her husband. The money never passed through J. C.'s hands.

Further, the money was not given in exchange for a note. After Anne's parents had agreed to lend the money, Anne insisted that J. C. give her parents a note. She, with the aid of her mother, told J. C. what to put in the note. J. C. followed their directions precisely and wrote out, in his handwriting, a note for the indebtedness.

The money was used as a portion of the down payment on the house on West Seminary Avenue. The house was conveyed to J. C. and Anne as tenants by the entirety.

We find ample credible evidence to support the trial court's finding that Anne and J. C. were joint obligors on a $4,000 loan made by Anne's parents to J. C. and Anne. Thus, we conclude that there was no error in the trial court's resolution of the issue whether a joint obligation was proved.

In her third argument, Anne contends that even if she was jointly obligated to repay the $4,000 loan she is not liable in contribution to J. C. because, in her view, J. C. voluntarily paid off the loan. She submits that her parents never demanded payment from J. C. and thus he was under no compulsion to pay off the loan. Anne's third argument must also be rejected because we think that in repaying the $4,000 J. C. acted under legal compulsion and not as a volunteer.

The general principles concerning legal compulsion and the law of contribution are well stated in Am. Jur.2d:

> To entitle one co-obligor to contribution from the others, it is the general rule that the *payment made by him must have been compulsory in the sense that he must have been under legal obligation to pay.* A voluntary payment which he is not under legal obligation to make does not give a right of action against his co-obligors for contribution; but *it is sufficient if the payment is made under a legal and fixed obligation. . . .*
>
> In general, a party to a common obligation is not, before an otherwise sufficient payment will entitle him to contribution, obliged to wait until his co-obligor requests payment to be made, nor is he obliged to wait until the obligee brings suit, secures judgment against him, procures an execution to issue, levies upon his goods, or otherwise extorts payment from him. *A payment made* for his own protection *as soon as the obligation becomes due* and the liability of the co-obligors is fixed *is, in legal contemplation, compulsory and not voluntary.*

18 Am. Jur.2d *Contribution* § 11 (1965) (emphasis added). *See generally Midwest Mutual* v. *Aetna Casualty*, 216 Va. 926, 929, 223 S.E.2d 901, 904 (1976); and *Jackson Company* v. *City of Norfolk*, 197 Va. 62, 66, 87 S.E.2d 781, 784 (1955), and authorities cited therein. Thus, if the obligation was due at the time J. C. made his payment he is entitled to contribution from Anne.

 Although J. C. proved the existence of a joint obligation on which he and Anne were joint obligors, the evidence is silent as to when the obligation was to be repaid. Yet, this silence simply means that the obligation proved by J. C. was payable on demand. In *Young* v. *Ellis*, 91 Va. 297, 301, 21 S.E. 480, 482 (1895), we wrote as follows: "An agreement to pay money, no time being specified, is held to be an agreement to pay the same on demand. . . ." *See McDaniel* v. *Daves*, 139 Va. 178, 187, 123 S.E. 663, 665 (1924); and 14B M.J. *Payment* § 9 (Repl. Vol. 1978).

 Next, it is a rule of ancient origin in Virginia that an obligation payable on demand is due immediately. In *Bacon's Adm'r* v. *Bacon's Trustees*, 94 Va. 686, 687, 27 S.E. 576, 577 (1897), we wrote as follows on this issue: "A note or bond payable 'on demand' or 'on call' (which is the same thing) is payable at once, and interest and the statute of limitations commence to run from its date." In this case, then, even though Anne's parents did not demand payment from him in the sense in which that term might be used by laymen, J. C. was nevertheless, at the time he repaid the loan, under compulsion to do so because the loan was due.

In light of the foregoing, the decision of the trial court will be

*Affirmed.*

STEPHENSON, J., dissenting.

I do not believe the evidence supports a finding that the debt was the joint obligation of the McCombs. To the contrary, the evidence conclusively shows that the debt was the responsibility of J. C. McComb alone. Bernard Blankenship, one of the creditors, testified that J. C. was the sole obligor, and the evidence does not indicate that Anne McComb ever promised to pay her parents or that they expected payment by her.

Although J. C. testified that the debt was a joint obligation, his acts totally belie his words. The note was written and signed by J. C. at a time when, according to the trial court's finding, Anne McComb was not present. It states, "I J. C. McComb promise to pay . . . the four thousand dollars . . . *lent to me* . . . ." (Emphasis added.) Moreover, it is most significant that, when J. C. satisfied the note, he paid $4,000, rather than $2,000, the amount he claims he owed.

Despite this evidence, the majority concludes that the trial court correctly found the McCombs jointly liable for the debt. Parental concern motivated the loan, and obviously Anne McComb benefitted from the money. The majority, however, confuses "joint benefit" with "joint obligation." In my view, the evidence compels the conclusion that, in advancing the money, Anne's parents intended to confer a joint benefit to Anne and J. C. but to impose on J. C. alone the legal obligation to repay.

J. C.'s voluntary payment of the debt is a further reason why his claim is meritless. Although the note was payable "on demand," no demand was made by the creditors. To the contrary, J. C. testified that when he wrote his father-in-law a check, Blankenship "told [him] he wouldn't take it. He said, 'I know you don't have it.' . . . And he gave me the check back and said, 'I don't want this.' " Nevertheless, later the same night, J. C. went to the Blankenships and said, "please take this money because I have heard nothing but about this money for I don't know how long." Bernard Blankenship testified, "[m]y wife and I never asked him for a cent of that money."

The evidence is conclusive, therefore, that the creditors neither demanded payment, nor had any intention of requiring payment until J. C. was financially independent. For the doctrine of contribution to apply, "the payment must have been made upon a debt for which the defendant [Anne McComb] was legally liable at the time of the payment, and which the obligor who pays [J. C. McComb] was compellable to pay . . . ." *Turner's Adm'r* v. *Thom, Trustee*, 89 Va. 745, 747, 17 S.E. 323, 324 (1893). Obviously, J. C. was under no compulsion to pay.

In sum, Anne McComb was not an obligor, and, even if she were, J. C. McComb was not compelled to satisfy the obligation. For these reasons, I would reverse the judgment of the trial court and enter judgment for Anne McComb.

COCHRAN and COMPTON, JJ., join in dissent.