**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MEGATECH, INCORPORATED; MMG
INTERNATIONAL, INCORPORATED,
Plaintiffs-Appellees,

v.

NSD ACQUISITIONS LP; KIMBER
MANUFACTURING, INCORPORATED,

Defendants-Appellants,

and

JP MANUFACTURING CORPORATION;
LESLIE EDELMAN; NATIONWIDE SPORTS
DISTRIBUTORS, INCORPORATED,
Defendants.

No. 99-2344

MEGATECH, INCORPORATED; MMG
INTERNATIONAL INCORPORATED,
Plaintiffs-Appellants,

v.

NSD ACQUISITIONS LP; KIMBER
MANUFACTURING, INCORPORATED,

Defendants-Appellees,

and

JP MANUFACTURING CORPORATION;
LESLIE EDELMAN; NATIONWIDE SPORTS
DISTRIBUTORS, INCORPORATED,
Defendants.

No. 99-2345

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-98-27)

Argued: April 4, 2000

Decided: June 5, 2000

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge,
and Roger J. MINER, Senior Circuit Judge of the
United States Court of Appeals for the Second Circuit,
sitting by designation.

_____

Affirmed in part, reversed in part, and remanded with instructions by
unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** David Gary Tripp, LAW OFFICES OF DAVID TRIPP,
Fairfax, Virginia, for Appellants. Peter Steven Pearlman, COHN,
LIFLAND, PEARLMAN, HERRMANN & KNOPF, Saddle Brook,
New Jersey, for Appellees. **ON BRIEF:** Leonard Z. Kaufmann,
COHN, LIFLAND, PEARLMAN, HERRMANN & KNOPF, Saddle
Brook, New Jersey; Karl W. Pilger, BORING & PILGER, P.C.,
Vienna, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

NSD Acquisitions LP ("NSD") and Kimber Manufacturing, Inc. ("Kimber") appeal from the district court's grant of summary judgment for MMG International, Inc. ("MMG"). Concluding that NSD assumed the duty to pay MMG commissions due under a Representative Agreement between MMG and JP Manufacturing Corporation ("JP"), NSD's predecessor-in-interest, the district court held NSD and Kimber jointly and severally liable for the $300,972 awarded in damages. By cross-appeal, MMG challenges the district judge's calculation of damages and prejudgment interest. We affirm in part, reverse in part, and remand with instructions.

I.

From 1992 until September 3, 1996, JP manufactured and sold precision metal parts, including firearms, for commercial and military markets. In February 1995, JP entered into a Representative Agreement with MMG whereby MMG agreed to market JP's products in exchange for certain commissions. Though MMG was successful in securing orders, JP nonetheless ran into financial difficulties and was unable to purchase materials or pay vendors. Searching for a purchaser of its assets, JP entered into an agreement with Global Precision Manufacturing Corporation ("Global"). Global, however, failed to raise the necessary money and the sale never closed.

JP next turned to Nationwide Sports Distributors, Inc. ("Nationwide"), JP's largest customer. MMG had introduced Nationwide to JP in late 1994, and as a result of MMG's efforts, Nationwide purchased 10,000 Model 1911 pistols from JP. Hoping to secure a permanent supply of Model 1911 pistols, Nationwide's president, Leslie Edelman, agreed to purchase JP's assets through NSD. Formed under the laws of Pennsylvania solely for the purchase of JP's assets, NSD consists of JPNY, Inc. ("JPNY"), a general partner, and Kimber, a limited partner. Edelman is the president and sole shareholder of Kimber, president of JPNY, and president of NSD.

3

JP and NSD executed an Asset Purchase Agreement on August 21, 1996, and closed the deal on September 3, 1996. Nine days after the closing, NSD, doing business as Kimber, informed MMG "that Kimber Mfg., Inc. does not recognize nor does it have any obligation to you under the . . . Representation Agreements." J.A. 362. Asserting that NSD had assumed JP's liabilities regarding payment of commissions, and demanding payment of commissions due, MMG filed suit in the Southern District of New York against the Edelman entities.[1] Citing a choice-of-venue clause in the Representative Agreement requiring litigation to be commenced in Virginia, the district court dismissed the complaint. MMG refiled in Virginia state court, and the defendants removed the action to the Eastern District of Virginia on grounds of diversity. Hearing cross-motions for summary judgment after the completion of discovery, the district judge entered judgment against NSD and Kimber jointly and severally for $300,972 following a one-day bench trial on the issue of damages.[2] The court concluded that NSD breached the Representative Agreement, and, in the alternative, found NSD and Kimber liable on quasi-contractual grounds. NSD and Kimber appeal; MMG cross-appeals the judge's calculation of prejudgment interest and the judge's refusal to grant MMG commissions on a sale that is currently the subject of litigation in Tennessee.

II.

A summary judgment motion should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The court must consider

_____

[1] In the original action, MMG and its sister corporation Megatech Inc., brought suit against NSD, Kimber, JP, Leslie Edelman, and Nationwide. The complaint consisted of thirteen counts and raised claims sounding in tort, fraud, contract, and quasi-contract. For purposes of this appeal, the only remaining parties are MMG, Kimber, and NSD.

[2] This amount represents commissions earned from September 1996 to March 1998, the date of Nationwide's bankruptcy. The lion's share of the damages results from the original 10,000 pistols purchased by Nationwide and Nationwide's repeat orders which were covered by section 6.8 of the Representative Agreement.

4

the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

A.

NSD's assumption of the liability to pay MMG's commissions hinges on the language of the Asset Purchase Agreement. Issues of contractual interpretation are reviewed de novo . See United States v. Martin, 25 F.3d 211, 217 (4th Cir. 1994). According to the Asset Purchase Agreement, the laws of Pennsylvania govern its construction. When the contract's terms "are clear and unambiguous the [parties'] intent is to be discovered only from the express language of the agreement." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982). An ambiguity exists if the terms "are subject to more than one reasonable interpretation." Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999). Courts, however, are forbidden to "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." Id. In sum, absent an actual ambiguity, "the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." Steuart, 444 A.2d at 661.

Under section 1(c) of the Asset Purchase Agreement, NSD agreed to "assume the Assumed Liabilities." J.A. 315."[NSD] shall not assume or be bound by any duties, responsibilities, obligations or liabilities of [JP] of any kind or nature, known, unknown, contingent or otherwise, other than those obligations and liabilities referred to herein as the Assumed Liabilities expressly assumed by it." J.A. 292. Assumed Liabilities, central to the dispute at issue, is defined, in pertinent part, as "all obligations of [JP] under the agreements, contracts, leases, licenses, and other arrangements referred to in the definition of Acquired Assets." J.A. 288. Turning to the definition of Acquired Assets, we find that it includes "agreements, contracts, purchase orders, indentures, mortgages, instruments, Security Interests, guaranties, and other similar arrangements and rights thereunder" which are not listed in the Excluded Assets. J.A. 286. The Excluded Assets section makes no mention of the MMG contract. In light of the broad definition of Acquired Assets and the omission of the MMG contract from the assets excluded, the plain language of the contract compels

5

the conclusion that NSD assumed the liabilities under the Representative Agreement, including the duty to pay MMG duly earned commissions.

NSD counters that the language referring to liabilities "expressly assumed" at the very least renders the contract ambiguous. These two words, according to NSD, should lead the court away from the broad definition of Acquired Assets. Under NSD's analysis, upon encountering the "expressly assumed" language, the court should ignore the Assumed Liabilities and Acquired Assets portions of the contract, and instead search for an Expressly Assumed Liabilities section. Because such a section does not exist, NSD concludes that the contract does not contemplate assumption of the MMG Representative Agreement.

Though inventive, we conclude that NSD's mode of analysis is at best an attempt to manufacture an ambiguity. Under Pennsylvania law, we must not focus on the absence of an enumeration in the contract, but rather "the terms of the agreement as manifestly expressed." Steuart, 444 A.2d at 661. And the express language of the contract directs the court to the Assumed Liabilities section, which in turn directs the court to the Acquired Assets section. Because the MMG Representative Agreement, by the terms of the Asset Purchase Agreement, clearly falls under Acquired Assets and is not mentioned in Excluded Assets, NSD cannot escape its assumption of the MMG contract.

NSD also invites the court to examine parol evidence. The parol evidence rule is one of substance, and therefore the law of the forum state must be applied. See Childers Oil Co. v. Exxon Corp., 960 F.2d 1265, 1269 (4th Cir. 1992). Virginia decisional law does not indicate whether the Virginia Supreme Court, under its conflicts rules, would apply its own or Pennsylvania's parol evidence decisions. See Rock-Ola Mfg. Corp. v. Wertz, 282 F.2d 208, 210 (4th Cir. 1960). However, we need not linger over this question because both states permit parol evidence in suits involving a stranger to the writing. See McComb v. McComb, 307 S.E.2d 877, 879 (Va. 1983) (holding that "the parol evidence rule operates only between the parties to a writing and has no application in a suit involving strangers to the writing nor in a suit involving one party to the writing and a stranger thereto"); In re Sewer Dist. No. 4, 24 A.2d 678, 679 (Pa. Super. Ct. 1942) ("The parol

6

evidence rule does not apply generally in case of a stranger to the contract."). Because MMG is a stranger to the Asset Purchase Agreement, parol evidence may be considered.

NSD points out that JP's Asset Purchase Agreement with Global formed the basis of the agreement with NSD. The Global agreement contained specific provisions providing for the assumption of the Representative Agreement, but this section was dropped from the NSD agreement. Moreover, before the closing JP demanded that NSD sign an assumption agreement in which NSD would agree to assume liabilities, including "all obligations of [JP] under the agreements, contracts, leases, licenses, and other arrangements referred to in the definition of Acquired Assets." J.A. 358. NSD refused to accept the assumption agreement, and the closing occurred even though JP had reserved the right not to close if NSD rejected the assumption agreement. From this history of the Asset Purchase Agreement, which NSD describes as an "evolution," NSD argues it did not assume the Representative Agreement. While we agree that the Asset Purchase Agreement underwent changes from the version signed by Global, we disagree with NSD on the extent of the evolution. For all the changes proposed and made, the Agreement retained its broad language concerning the assumption of assets and liabilities. As evidenced by numerous emendations, the parties consciously retained the Excluded Assets section of the original Global agreement yet declined to list the MMG contract among the assets excluded. The parol evidence is simply inadequate to explain away the clear language of the contract which resulted from arm's length negotiations. In sum, the parol evidence offered by NSD does not change our conclusion that the Representative Agreement was assumed.

B.

NSD also argues that the Representative Agreement forbids assignments without the written consent of MMG. Because MMG never consented in writing to NSD's assumption of the Representative Agreement, NSD concludes that MMG may not demand commissions due. The Representative Agreement, however, provides that it "may not be assigned or transferred by [MMG] without the express written prior consent of [JP]." J.A. 166. This prohibition clearly applies only

7

to MMG's attempted transfers or assignments, and not those of JP. Hence, NSD's argument fails on this point.

C.

Finally, NSD argues that MMG lacks privity with NSD and thus cannot sue for breach of contract absent proof it was an intended third party beneficiary of the Asset Purchase Agreement. In general, when one company purchases the assets of another, "the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 308 (3d Cir. 1985) (applying Pennsylvania law) (internal quotation marks omitted). There are exceptions to the general rule, including when "the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor." Id. Because we have concluded that NSD assumed JP's liabilities and stands in JP's shoes as to MMG, the third party beneficiary theory is inapplicable. MMG, a party to the contract that NSD assumed, has standing to sue for breach of the Representative Agreement. **3**

III.

Kimber challenges the district court's decision to hold it jointly and severally liable with NSD for MMG's commissions. Kimber observes that by the terms of the Asset Purchase Agreement, NSD was the only entity that assumed JP's assets and liabilities. As a limited partner in NSD, Kimber contends that the district court erred in depriving it of limited liability. We review the district court's findings of fact for clear error and its legal conclusions de novo . Rutherford Hosp., Inc. v. RNH Partnership, 168 F.3d 693, 698 (4th Cir. 1999).

A district court sitting in diversity applies the forum state's conflict of laws rules. Under the Virginia Code, "the laws of the state or other jurisdiction under which a foreign limited partnership is formed govern its formation and internal affairs and the liability of its limited

_____

**3** In the alternative, the district court also granted summary judgment in favor of MMG on quasi-contractual grounds. Because we affirm summary judgment on the breach of contract, we do not reach the district court's alternative holding.

8

partners." Va. Code Ann. § 50-73.53 (Michie 1998). Hence, the court must turn to Pennsylvania law to determine Kimber's liability.

Under Pennsylvania law, a limited partner will not be personally liable to third parties unless (1) the limited partner "participates in the control of the business", and (2) the third party transacting business with the limited partnership reasonably believes,"based on the conduct of the limited partner, that the limited partner is a general partner." 15 Pa. Cons. Stat. Ann. § 8523(a) (West 1995); see also In re Labrum & Doak, LLP, 237 B.R. 275, 301 (Bankr. E.D. Pa. 1999) ("Limited partners surrender the right to participate in the conduct of the partnership's business in exchange for limited liability."). In concluding that NSD and Kimber were "effectively the same entity," J.A. 841, the district court relied on the following facts:

- NSD trades as Kimber Manufacturing, Inc.

- NSD has no employees and leases employees from Kimber

- NSD and Kimber have the same fax number

- NSD and Kimber are represented by the same attorney

- the letter terminating MMG's representation of NSD was sent on Kimber letterhead

- Edelman is the only officer and director of Kimber

- Edelman is the president of NSD

We believe that the district court correctly concluded that Kimber, through Leslie Edelman, participated in the control of NSD. Edelman, as evidenced by his deposition testimony, was unable to distinguish between NSD and Kimber, and in general ignored the separate identities of the entities he controlled. Acting in his capacity as the president of Kimber, Edelman discarded his NSD puppet shortly after the closing of the Asset Purchase Agreement and openly operated JP's former business as Kimber. Without question, Kimber controlled

9

NSD. In addition, MMG had no reason to believe that Kimber was anything but a controlling entity or general partner. The letter terminating the Representative Agreement, dated nine days after the closing, was written on Kimber stationary, sent by an entity doing business as Kimber, and made no mention of NSD. Such an unequivocal assertion of authority could have reasonably led MMG to believe that Kimber was the controlling entity or general partner. Hence, the district court did not err in holding NSD and Kimber jointly and severally liable for MMG's commissions.

IV.

A.

NSD next challenges the district court's conclusion that Nationwide's December 1994 order for 10,000 pistols was covered under the Representative Agreement, which was signed on February 1, 1995. As noted by the district judge, the Representative Agreement contemplates purchase orders in existence prior to February 1995. For example, section 6.1 provides for commissions "on proceeds from the current order of the `Dessert Eagle' [sic] by Tass." J.A. 161. Sections 6.7 and 6.8 provide for commissions on pistol orders and repeat orders, "including any additions and amendments to and reductions from the purchase order." J.A. 162. Moreover, Annex C of the Representative Agreement specifically refers to the Nationwide purchase order and authorizes MMG to continue efforts to secure additional sales. NSD does not dispute that JP had begun to fill the purchase order before the asset sale and that JP paid MMG some commissions on the order prior to the asset sale. We agree with the district court that the Representative Agreement contemplated pre-existing orders, including the Nationwide order referred to in Annex C. As JP's successor-in-interest, NSD assumed the duty to continue with the payment of commissions on the original Nationwide order as well as any additions to the order. In sum, the district court did not err in finding that the sale to Nationwide was covered by the Representative Agreement.

B.

NSD also argues the MMG is due no commissions because the sale to Nationwide was nothing more than a transfer between commonly-

10

owned businesses. This characterization ignores that MMG introduced Edelman to JP, and that Edelman did not own JP when Nationwide placed the December 1994 order for 10,000 pistols. Edelman's later acquisition of JP's assets--almost two years after the 1994 order --did not erase MMG's efforts. By the terms of the Asset Purchase Agreement, NSD assumed the Representative Agreement and the accompanying duty to pay MMG commissions earned. NSD and JP did not include the MMG contract with the "Excluded Assets"; therefore, we cannot permit NSD to enjoy the results of MMG's services without paying duly earned commissions.

C.

NSD also challenges the inclusion in the damages award of commissions resulting from a sale to the Israel Military Industries ("IMI"). The district judge's calculation of damages is reviewed for clear error. See United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co., 86 F.3d 332, 334 (4th Cir. 1996). In the Asset Purchase Agreement, the parties listed the $150,000 account receivable from the IMI sale as an excluded asset. Because NSD could not produce "documentary proof of that payment [to JP], such as a canceled check," the district court concluded that MMG was entitled to a $3000 commission from NSD. J.A. 837. We agree with NSD that the district judge erred on this point. Under the terms of the Asset Purchase Agreement, NSD was not to receive the monies due from IMI, and an affidavit offered by MMG indicated that JP had indeed received the $150,000. Surveying the record, we find nothing to indicate why NSD would have IMI's canceled check, or why the court required more proof that NSD had no entitlement to the $150,000. MMG should look to JP for its $3000 commission, not NSD. Thus, the district court clearly erred in including the $3000 in MMG's damages.

V.

A.

By way of cross-appeal, MMG asserts that the district court erred in the calculation of prejudgment interest. The parties agree that under Virginia conflicts rules, New York law governs the calculation of pre-

11

judgment interest. The relevant New York statute provides that "[w]here such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred." N.Y. C.P.L.R. § 5001(b) (McKinney 1992). But if the precise dates are not ascertainable, the court awards damages "from a single reasonable intermediate date." Id.; see also Rose Assoc. v. Lenox Hill Hosp., 695 N.Y.S.2d 1, 2 (N.Y. App. Div. 1999) (affirming award of prejudgment interest from the midway point of tenant's holdover period). Because of the continuing nature of the breaches and lack of precise evidence, the district court awarded MMG prejudgment interest "for half of the three years since the breaches began, or 18 months." J.A. 839. MMG argues that there was sufficient evidence in the record to calculate damages from the date each commission was due. In support of its position, MMG presents a chart which gives the invoice dates of the various sales of pistols. However, the Representative Agreement provides that commissions shall be paid within fifteen days after receipt of payment, and MMG provided no information dealing with actual payment. Given the lack of information on the date of actual payment, the district judge's use of an intermediate date to calculate prejudgment interest was not clearly erroneous.

B.

Finally, MMG challenges the district court's decision regarding pistol sales to All American Sales, Inc. ("All American"). NSD and All American are currently litigating in Tennessee to determine whether All American ordered 100 or 2500 pistols. All American asserts that it ordered 2500 pistols from JP and only 100 have been delivered. NSD, as JP's successor-in-interest, argues that All American purchased only 100 pistols. MMG has been paid its commission on the 100 pistols shipped to All American.

At the summary judgment hearing in the present case, MMG asked the district judge to issue an order providing that MMG is entitled to its 2.5 percent commission on the remainder of the All American sale if the Tennessee court determines that the order was for 2500 pistols rather than 100. The district court refused, stating that "[e]ven if All American prevails in that litigation . . ., there still would have been no sale of the 2,400 pistols on which MMG could collect a commission. If the Tennessee court orders JP to sell 2,400 more pistols to All

12

American, MMG would still not be entitled to those commissions because that sale would be the product of a court order, not MMG's marketing work." J.A. 833. We disagree with the district court's analysis. It is axiomatic that courts enforce, rather than write, contracts. The purpose of the Tennessee litigation is to determine whether All American contracted for the purchase and delivery of 100 or 2500 pistols. If the Tennessee court concludes that NSD owes All American 2400 more pistols, then MMG is entitled to a commission on the pistols just as it was on the first 100 of the order. Hence, we remand to the district court to enter an order on the All American sale consistent with this opinion.

VI.

For the foregoing reasons we affirm the district court's grant of summary judgment in favor of MMG on the breach of contract claim. However, we reverse the district court's inclusion of the IMI commissions in the damages award and the court's refusal to grant MMG commissions, contingent on the outcome of the Tennessee litigation, on the All American sale.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS