**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RUTHERFORD HOSPITAL,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.

No. 98-1199

RNH PARTNERSHIP,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Shelby.
Max O. Cogburn, Magistrate Judge.
(CA-96-327-4-C)

Argued: October 28, 1998

Decided: February 5, 1999

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
BLAKE, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Blake wrote the opinion, in
which Judge Murnaghan and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Joseph Branch Craige Kluttz, KENNEDY, COVING-
TON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina,
for Appellant. Maureen Demarest Murray, SMITH, HELMS, MUL-
LISS & MOORE, L.L.P., Greensboro, North Carolina, for Appellee.

**ON BRIEF:** Kiran H. Mehta, Sara W. Higgins, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Appellant. Terrill Johnson Harris, SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, North Carolina, for Appellee.

_____

## OPINION

BLAKE, District Judge:

In December 1996, Rutherford Hospital, Inc. ("Rutherford"), filed a declaratory judgment action in federal district court seeking a ruling that it owns "all right, title and interest in the appropriate license and approval for all beds necessary to operate" the Woodlands Skilled Nursing Center (formerly known as the Rutherford Nursing Center). J.A. 12. Rutherford currently operates the nursing home under two leases from RNH Partnership ("RNH"), which owns all of the facility's property, structures, and equipment. The district court denied Rutherford's claim, finding that "upon expiration of the leases, [Rutherford] has no rights whatsoever to own or operate the nursing facility or nursing beds." J.A. 555-56. For reasons different from those relied upon by the district court, we affirm.

I.

The Woodlands Skilled Nursing Center is located in Rutherfordton, North Carolina, and was built by RNH in the late 1970s. The original operator of the facility was a company named ISO, Inc. ("ISO"). ISO operated the nursing home under two leases it signed with RNH in July 1977. The leases, which later were acquired by Rutherford, are scheduled to expire in April 2000 and cover the facility's real and personal property. RNH and ISO obtained all necessary federal and state authorizations to construct and operate the nursing home. Rutherford acknowledges that these various authorizations "imply no property rights in the nature of an exclusive franchise for operation of a medical facility." Ruth. Br. 11.

ISO operated the nursing home until 1988, when it filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for

2

the Middle District of North Carolina. As part of the bankruptcy proceedings, in June 1988 the bankruptcy court approved the sale of ISO's interests in four nursing homes that ISO owned or operated, including the Woodlands Skilled Nursing Center (then known as the Rutherford Nursing Center). A copy of the bankruptcy court's order and Notice to Interested Parties was mailed to Rutherford along with forty other potential buyers. In the notice, the Rutherford Nursing Center was identified as a 150-bed facility "leased" by ISO through the year 2000 with "no extensions." J.A. 1246. In contrast, ISO's interests in two other nursing homes that it operated were identified as "fee simple" ownership. Id. In addition to the Notice to Interested Parties, ISO prepared and distributed a "prospectus" describing the four nursing homes. With respect to the Rutherford Nursing Center, the prospectus indicated that "[t]he facility and land are owned by RNH Partnership of Glenview, Illinois. The operations and facility are leased by ISO, Inc. d/b/a/ Rutherford Nursing Center on a straight 20 year lease expiring on April 1, 2000." J.A. 1799.

At the ensuing auction, Rutherford was the highest bidder for ISO's interest in the Rutherford Nursing Center. To complete the transaction, Rutherford and ISO entered into an Agreement of Sale and Purchase dated August 8, 1988. The Agreement stated that "Seller and Buyer desire to enter into this Agreement whereby Buyer is to purchase the leases hereinafter described, and consisting of a nursing home building designed for 150 beds located thereon and known as `RUTHERFORD NURSING CENTER', together with related personal property, under the terms and conditions hereinafter set forth." J.A. 1129. More specifically, under the heading "Purchase and Sale," the Agreement purported to convey the following three items to Rutherford:

> A. The Lease from RNH Partnership to ISO, Inc. for the nursing facility and surrounding lands as referenced in Lease dated July 22, 1977 and expiring April 1, 2000.

> B. The Lease for personal property located in said nursing facility, dated July 22, 1977 between RNH Partnership and William L. Rambo [ISO's principal], with the exception of certain medical supplies and perishable goods, with said Lease expiring April 1, 2000.

3

C. All right, title and interest in Certificate of Need issued by the North Carolina Department of Human Resources, Division of Facility Services, dated March 18, 1976, under # C-0525-76, including the appropriate license and approval for all beds necessary to operate the Rutherford Nursing Center; all rights to the trade name Rutherford Nursing Center.

J.A. 1130.

The validity of the conveyance of the real and personal property leases (sections A and B above) is not disputed by RNH. See RNH Br. 31-32. Rather, the controversy in this case centers around the meaning and significance of section C, which apparently was intended to transfer from ISO to Rutherford the state-mandated "certificate of need" (explained below) that allegedly had been issued for the nursing home in 1976. In fact, the parties agree that no certificate of need relating to the nursing home had ever been issued to RNH or ISO or to any other party. See Ruth. Br. 13; RNH Br. 9; J.A. 541. The certificate or license referred to in section C simply did not (and does not) exist.[1]

On September 20, 1988, the bankruptcy court entered its order confirming the sale of ISO's interest in the Rutherford Nursing Center to Rutherford, "subject to the terms and conditions of the Asset Purchase Agreement." J.A. 1288. The order specified that "the Assets to be conveyed include a real property lease and an equipment lease between ISO, Inc. and RNH Partnership (dated July 22, 1977 and

_____

[1] It is worth noting that section C is the only part of the sales agreement between ISO and Rutherford that mentioned a "certificate of need." Other relevant provisions of the sales agreement referred only to the two leases. For example, part 2 of the agreement stated that "[t]he purchase price to be paid by the Buyer to the Seller for the Leases shall be [$810,000]." J.A. 1130. Part 6 of the agreement stated that "Seller has full power and authority to enter into this Agreement and to convey, transfer and assign the Leases in accordance with the terms hereof" and that "THE LEASES ARE BEING SOLD AS IS." J.A. 1131. And part 15 of the agreement specified that at closing, "Seller shall deliver to Buyer the . . . Assignment of Leases herein referenced." J.A. 1134.

4

expiring April 1, 2000), which leases have been assumed by the Debtor ISO, Inc. and which are being assigned to the purchaser in accordance with an order approving Debtor's assignment of Leases entered simultaneously with this Order." J.A. 1287-88. The order made no reference to any certificate of need for the facility.

In early 1992, a conversation between the new administrator of the nursing home and an industry consultant prompted Rutherford to inquire as to the status of the certificate of need ("CON") for the facility. In March 1992, in response to Rutherford's inquiry, the North Carolina Department of Human Resources, Certificate of Need Section ("Department"), informed Rutherford that "ownership of the home and the ownership of the CON resides with the owner of the facility" and that following the expiration of Rutherford's leases with RNH, RNH "would retain the CON." J.A. 2018. [2] Concerned about which party possessed the ongoing authority to operate the nursing home, in July 1995 Rutherford filed a declaratory judgment action in the Superior Court for Rutherford County, North Carolina, against both RNH and the Department. That suit ultimately was dismissed for lack of subject matter jurisdiction due to Rutherford's failure to exhaust its state administrative remedies. Rutherford and the Department subsequently reached a settlement.[3]

_____

[2] The Department mistakenly believed that a certificate of need had been issued for the facility.

[3] In the Settlement Agreement, dated December 6, 1996, the Department "t[ook] no position concerning the effect of the Sale Order" entered by the bankruptcy court in September 1988. J.A. 294. The Department agreed to be bound, however, by the following provision:

> Given the unique circumstances of this case, the Department stipulates and agrees that if a court of competent jurisdiction declares that RNH is barred or otherwise estopped from denying that [Rutherford] owns all right, title, and interest in the appropriate license and approval for the beds necessary to operate the Nursing Facility, then [Rutherford] is vested with the exclusive right to own and maintain the beds in question, notwithstanding expiration of the lease in question in April 2000, and is "grandfathered" with respect to such rights under the Certificate of Need Law.

J.A. 296.

5

Rutherford filed the present suit in the United States District Court for the Western District of North Carolina in December 1996. Rutherford is seeking a declaratory judgment that RNH "is forever barred from asserting that [Rutherford] does not own all right, title and interest in the appropriate license and approval for all beds necessary to operate the Nursing Home, including any Certificate of Need or equivalent authorization, free and clear of all liens, claims and interests of [RNH] or any other party." J.A. 12. The basis for Rutherford's claim is the purported sale, confirmed by the bankruptcy court, of the "license and approval" required to operate the nursing home as set forth in section C of the August 1988 sales agreement between Rutherford and ISO. See Ruth. Br. 19-20, 25-26.

After a two-day bench trial, the district court **4** ruled in favor of RNH, finding that Rutherford's only interest in the nursing home is "to operate and use the nursing facility and personal property for the terms of the leases." J.A. 552. In reaching its decision, the court apparently accepted Rutherford's position that "assets other than the leases with ISO" relating to RNH's "right to operate the beds after the expiration of the leasehold" existed at the time of the bankruptcy sale and were intended to be transferred to Rutherford by operation of the August 1988 sales agreement between Rutherford and ISO. J.A. 549, 551. The court refused to accord finality to the bankruptcy court's order confirming the sale as to these assets, however, because it concluded that RNH had not received proper notice "reasonably calculated under all the circumstances of this case to apprise [RNH] of such conveyance and afford it an opportunity to object." J.A. 551.**5** Rutherford now appeals.

_____

**4** Magistrate Judge Max O. Cogburn exercised jurisdiction in the case pursuant to 28 U.S.C. § 636(c).

**5** RNH acknowledges that it received a copy of Rutherford's motion to confirm the sale of ISO's interest in the nursing home prior to entry of the bankruptcy court's order, RNH Br. 11, but it interposed no objection to the sale. Nonetheless, in denying Rutherford's requested declaratory relief, the district court found that "neither the Sale Agreement nor the order confirming sale provided [RNH] with reasonable notice that its assets were in jeopardy of being conveyed to another party without compensation." J.A. 549. Since, as explained in part II of our opinion, we affirm the district court's decision on the alternate grounds that because no certificate of need was in existence at the time of the sale, one could not have been conveyed by ISO to Rutherford, it is unnecessary for the court to address further the question of whether RNH received proper notice of the bankruptcy sale.

6

II.

We review the district court's findings of fact for clear error and its conclusions of law de novo. Richman v. First Woman's Bank (Matter of Richman), 104 F.3d 654, 656 (4th Cir. 1997). We may affirm the district court's judgment on any grounds raised by the parties below. Nyonteh v. Peoples Sec. Life Ins. Co., 958 F.2d 42, 45 (4th Cir. 1992) (per curiam). Because we conclude that the assets conveyed to Rutherford as a result of the 1988 sale confirmed by the bankruptcy court did not include a certificate of need for the Rutherford Nursing Center (now known as the Woodlands Skilled Nursing Center), we affirm the district court's declaration that Rutherford "owns the right, title, and interest to operate and use the nursing facility and personal property for the terms of the leases, [but that] upon expiration of the leases, has no rights whatsoever to own or operate the nursing facility or nursing beds." J.A. 555-56.

It is the public policy of North Carolina to regulate the construction and operation of health care facilities. See N.C. Gen. Stat. § 131E-175 et seq. (describing "certificate of need" requirements). Accordingly, any person proposing the development and provision of "new institutional health services," including certain changes in existing services, is required by law to obtain a "certificate of need" from the state before going forward with the project. See id. §§ 131E-178 & -190. Each certificate of need is particularized as to the person to whom and the project for which permission to build and offer health care services is granted. See id. § 131E-181. In essence, a certificate of need is a special kind of license needed to construct and operate any "new" health care facility in North Carolina. See id. § 131E-176(16) (defining "new institutional health services"). **6**

The certificate of need law does not apply, however, to projects which received the requisite federal approval prior to January 1, 1979, and on which construction commenced before January 1, 1980. In re

_____

**6** We think that Rutherford's characterization of the certificate of need statute as establishing "a system of state[ ]-mandated franchises for operation of health care facilities," Ruth. Br. 12, is off the mark. A certificate of need is more akin to a traditional business license or construction permit than to a franchise agreement.

Wilkesboro, Ltd., 55 N.C. App. 313, 315-16 (1982). The nursing home at issue in this case was exempted from the law's requirements under this "grandfather" provision. Furthermore, no certificate of need is required simply to continue operating a nursing home, unless certain types of changes are made in any of its facilities, equipment, or services. See N.C. Gen. Stat. § 131E-176(16). The mere expiration of a lease agreement pursuant to which one party manages a nursing home owned by another is not one of the qualifying changes listed in the statute. See id. Thus, so long as no qualifying changes are made to the Woodlands Skilled Nursing Center following the expiration of Rutherford's leases with RNH, no certificate of need will be required to continue operating the facility in the future.

The central question that Rutherford's declaratory judgment action seeks to answer is whether it or RNH owns the future "operating rights" for the nursing home, separate and apart "from the rights encompassed by the two Leases." See Ruth. Br. 3, 20. In answering this question, the main point that the parties and the district court seem to have lost sight of is the undisputed fact that no certificate of need pertaining to the Rutherford Nursing Center was ever issued to RNH, ISO, or to any other party. Furthermore, no certificate of need has since been issued for its successor, the Woodlands Skilled Nursing Center. Since no certificate of need for the nursing home existed as of the date of the bankruptcy court's sale of ISO's assets to Rutherford, Rutherford could not have acquired, and does not now possess, such a license for the facility.

Under the federal bankruptcy laws, a debtor's estate consists, inter alia, of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). "The estate under § 541(a) succeeds only to those interests that the debtor had in property prior to commencement of the bankruptcy case." In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988). While it is of course true that a bankruptcy court's order of confirmation "is treated as a final judgment with res judicata effect," In re Varat Enterprises, Inc., 81 F.3d 1310, 1315 (4th Cir. 1996), a bankruptcy court's jurisdiction does not extend to property that is not part of a debtor's estate. See, e.g., In re Signal Hill-Liberia Ave. Ltd. Part., 189 B.R. 648, 652 (Bankr. E.D. Va. 1995) (citing cases); In re Murchison, 54 B.R. 721,

8

727 (Bankr. N.D. Tex. 1985) (citing cases).[7] Even if we were to agree with Rutherford that an owner of property mistakenly sold as part of a debtor's estate may, under certain circumstances, be estopped from claiming damages for the sale of that property, see, e.g., In re Hopkins Corp., 76 B.R. 612, 614-15 (Bankr. S.D. Ohio 1987), the fact remains that the certificate of need that Rutherford now claims it owns was not even in existence at the time of the 1988 bankruptcy sale, let alone part of ISO's estate, and therefore could not have been conveyed to Rutherford, mistakenly or otherwise.

Nonetheless, Rutherford contends that it was the intent of the parties to the 1988 sales agreement "that all `right, title and interest' in rights equivalent to rights under a certificate of need . . . be conveyed to Rutherford Hospital." Ruth. Br. 25 (emphasis added). By way of explanation, Rutherford argues that "the nature of the interest in the operating rights that was intended to be conveyed[in section C of the agreement] was different from the rights encompassed by the two Leases," Ruth. Br. 20, and that section C "was intended to relate to the operating authority, or the broader grant or franchise from the State of North Carolina" for the nursing home, Ruth. Br. 7. In response, RNH argues that "[t]here is no legal or factual support for Rutherford Hospital's position regarding the nature of the assets it thought it acquired from ISO" and that "[t]he evidence is overwhelming that the right to operate the nursing beds is inseparable from the

_____

[7] The district court erred when it asserted that our decision in Varat Enterprises, supra, stands for the proposition that "a bankruptcy court can convey away assets that are not part of the bankruptcy estate, so long as such conveyance satisfies the requirements of due process." J.A. 549. Varat Enterprises involved a dispute between two creditors as to which creditor was entitled to have its claim against the debtor satisfied out of the proceeds of a pre-bankruptcy arbitration award owed by another party to the debtor. See 81 F.3d at 1313-14. These proceeds clearly were part of the debtor's bankruptcy estate. Our decision in the case upheld the bankruptcy court's order confirming the debtor's reorganization plan that proposed to use the proceeds to pay the entire claim of one creditor before paying the second creditor's claim with whatever money remained. Id. The facts of Varat Enterprises and our opinion in the case thus had nothing to do with a situation in which a bankruptcy court confirms the sale of property belonging to a party other than the debtor.

9

nursing facility, and that such right belongs to RNH Partnership."
RNH Br. 15. We agree with RNH.**8**

Rutherford's position in this case rests upon a fundamental misconception, namely, that all health care facilities in North Carolina may only operate with the express approval of the state. This is not correct. Like the nursing home here, not all health care facilities in North Carolina are subject to the certificate of need statute's requirements. Moreover, other than a certificate of need, there is no "operating authority" or "broader grant or franchise" that a health care provider must secure from the state in order to develop and offer its services to the public. Thus, it is meaningless to speak of "rights equivalent to rights under a certificate of need." Either a certificate of need is required to operate a health care facility in North Carolina or one is not required. Rutherford has cited no statutory or judicial authority to support its contrary interpretation of North Carolina's certificate of need statute.

In this case, a certificate of need was not required to build and operate the Rutherford Nursing Center and, accordingly, one was never issued by the state to RNH, ISO, or to any other party. No certificate of need, therefore, could have been conveyed to Rutherford by

_____

**8** Rutherford further contends that RNH is barred from challenging the validity of the bankruptcy court's order confirming the sale of RNH's "operating rights" in the nursing home from ISO to Rutherford on the grounds that final orders of bankruptcy courts may not be collaterally attacked by parties with sufficient notice of the original bankruptcy proceedings. Ruth. Br. 20-25; see, e.g., Maryland v. Antonelli Creditors' Liquidating Trust, 123 F.3d 777, 782-83 (4th Cir. 1997). It is well established, however, that a bankruptcy court's final order may be attacked collaterally "based on the original court's lack of jurisdiction." Spartan Mills v. Bank of America Illinois, 112 F.3d 1251, 1255 (4th Cir. 1997). As explained above, the bankruptcy court in this case lacked jurisdiction to transfer any assets to Rutherford that not only were not part of ISO's estate, but did not even exist at the time of the bankruptcy sale. Consequently, RNH is free to argue in opposition to Rutherford's declaratory judgment action that notwithstanding the bankruptcy court's confirmation of the 1988 sales agreement, Rutherford "merely has leasehold interests in the nursing home and personal property that terminate at the end of the leases." RNH Br. 19.

10

operation of section C of its 1988 sales agreement with ISO. Furthermore, section C in no way purports to convey the rights to future certificates of need that may be required to operate the facility. Consequently, although Rutherford may claim that "it was ISO's intention to convey whatever operating authority, regulatory approval, franchise, permission or permit that ISO had from the state to go with the purchase," Ruth. Br. 7, to the extent that Rutherford is referring to a certificate of need, or anything "equivalent" thereto, no such conveyance took place. The only interests that Rutherford acquired in the Rutherford Nursing Center as a result of the 1988 bankruptcy sale were the two undisputed leases. The right to operate the nursing home following the termination of the leases remains with its owner, RNH. See Smith v. Simpson, 260 N.C. 601, 609, 133 S.E.2d 474, 481 (1963) ("Ownership of personal property ordinarily carries with it the right of control and use"); Hildebrand v. Telegraph Co., 219 N.C. 402, 408, 14 S.E.2d 252, 256 (1941) (owner's rights in property include "the right to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from its use").

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

11