COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, AtLee and Raphael
Argued at Lexington, Virginia

PUBLISHED

C. RAY DAVENPORT, COMMISSIONER
  OF LABOR AND INDUSTRY

                                                              OPINION BY
v.        Record No. 0285-21-3                    JUDGE ROBERT J. HUMPHREYS
                                                              JANUARY 18, 2022

UTILITY TRAILER MANUFACTURING COMPANY

FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Frederick A. Rowlett, Judge

Alex W. West, Special Assistant Commonwealth's Attorney
(Mark R. Herring,[1] Attorney General; Donald D. Anderson, Deputy
Attorney General; Heather Hays Lockerman, Senior Assistant
Attorney General and Section Chief; Joshua E. Laws, Assistant
Attorney General, on briefs), for appellant.

Travis W. Vance (David I. Klass; Fisher & Phillips, LLP, on brief),
for appellee.

On July 31, 2017, the Virginia Department of Labor and Industry ("the Commissioner")

issued a citation to Utility Trailer Manufacturing Company ("UTMC") for a violation of safety

standards issued by the Virginia Department of Labor and Industry Occupational Safety and

Health Administration ("VOSH"). UTMC contested the citation, and the Commissioner filed a

complaint in the Circuit Court of Washington County in accordance with Code § 40.1-49.4 to

enforce the citation.[2] At trial, the circuit court sustained UTMC's objection to the introduction

_____

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

[2] Pursuant to Code § 40.1-49.4(E), when a citation for a safety or health violation is
contested, the Commissioner is required to file a civil action in the circuit court for that court to
affirm, modify or vacate the citation or proposed penalty, or to direct other appropriate relief,
upon making findings of fact and conclusions of law.

of an investigative report generated by UTMC on the grounds that it was a subsequent remedial measure. Additionally, at the close of the Commissioner's evidence, the circuit court granted UTMC's motion to strike on the grounds that the Commissioner failed to prove the existence of a noncomplying condition. The Commissioner appealed these rulings to this Court pursuant to Code § 40.1-49.5.

BACKGROUND

On appeal of an order granting a motion to strike, we view the evidence in the light most favorable to the non-moving party—the Commissioner—and accord him "the benefit of any inferences that may be fairly drawn from the evidence." *Curtis v. Highfill*, 298 Va. 499, 502-03 (2020).

UTMC is a corporation that manufactures dry vans at a facility in Washington County ("the worksite"). To construct these dry vans, eighteen-foot-long slider rails are welded to cross members and vertical bars in a part of the worksite called the "marriage area." The slider rails are stored on a table some distance from the marriage area and must be transported via forklift to the marriage area before they can be welded to the cross members or bars. The cross members and vertical bars are stored in boxes on pallets that are placed near the path of the slider rails and the marriage area. The location of the pallets required the forklift operators to elevate the forks to prevent a collision between the long slider rails and the pallets.

On May 22, 2017, a forklift operator was transporting slider rails to the marriage area with the forks elevated when a welder turned into the slider rails, striking his face on the rails in the process. UTMC reported the incident to VOSH, which initiated an inspection.

The Code authorizes the Virginia Safety and Health Codes Board ("the Board") to promulgate and adopt regulations to assure "that no employee will suffer material impairment of health or functional capacity." Code § 40.1-22(5). Pursuant to this authorization, the Board has

incorporated several federal regulations, including 29 C.F.R. § 1910.176(a), into its administrative code. 16 Va. Admin. Code § 25-90-1910. 29 C.F.R. § 1910.176(a) reads as follows:

> Use of mechanical equipment. Where mechanical handling equipment is used, sufficient safe clearances shall be allowed for aisles, at loading docks, through doorways and wherever turns or passage must be made. Aisles and passageways shall be kept clear and in good repair, with no obstruction across or in aisles that could create a hazard. Permanent aisles and passageways shall be appropriately marked.

Following the inspection of the UTMC facility, the Commissioner issued a "serious violation" citation against UTMC.[3] The citation notes the following alleged violations:

> (a) Pallets with trailer parts stacked on them were allowed to be stored in an area commonly used by forklift operators to transport materials into the area. On May 22, 2017, a forklift operator was transporting a load of approximately 10 slider rails to the marriage area with a Hyster 60 forklift. Due to the pallets and trailer parts that were obstructing the forklift passageway, the forklift operator had to raise the load in order to clear the items in the forklift passageway. An employee who was retrieving a welding helmet nearby and had his back to the load, turned as the load approached and walked into the slider rails striking his nose and face and causing the rails to fall to the floor.
>
> (b) Aisle ways [sic] and passageways used by forklifts to transport slider rails to the marriage area welders were not appropriately marked. Items had been placed in the forklift path where the 18-foot-long slider rails were transported. The forklift operators often had to raise their loads several feet above the floor surface in order to clear the obstructions.

---

[3] Code § 40.1-49.3 defines "serious violation" as

> a violation deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

- 3 -

The Commissioner then issued a $4,845 penalty for the serious violation, which UTMC subsequently contested.[4]

Pursuant to Code § 40.1-49.4(E), upon receipt of written notice from UTMC that it contested the citation, the Commissioner filed a complaint in the circuit court. In his complaint, the Commissioner attached the citation as exhibit A and relied on its explanation of the violation as the basis for the complaint.

Trial began on November 19, 2020. The Commissioner's main witness was VOSH investigator Robert Farmer. Mr. Farmer's testimony was at times contradictory, but he testified that travelling with the forks elevated could have caused a visual hazard due to the load or the mast of the forklift. Mr. Farmer also testified that traveling with the forks raised could have created a collision hazard or a tip-over hazard and that traveling with raised forks posed a risk of "more significant injury" due to contact higher on the body. Finally, Mr. Farmer testified that the aisle in which the forklifts operated was not marked.

Additionally, the Commissioner called Keith Walsh, UTMC's safety manager and corporate representative. Following the accident, Mr. Walsh helped draft a report on behalf of UTMC detailing its view on the basic causes of the accident and necessary remedial steps to prevent future incidents. The Commissioner sought to introduce the report into evidence, but UTMC objected on the grounds of hearsay, subsequent remedial measures, and relevance. The

_____

[4] At the time of the citation, Code § 40.1-49.4 required the Commissioner to issue a civil penalty of up to $7,000 for any serious violations but made any penalty discretionary for an other-than-serious violation. Code § 40.1-49.4 permits the Commissioner to determine the exact amount of the penalty by giving "due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations." The Department of Labor and Industry has standardized its practices for determining the amount of a violation in its Field Operations Manual, but the manual "is not and does not purport to establish substantive law." *Nat'l Coll. of Bus. & Tech., Inc v. Davenport*, 57 Va. App. 677, 683 n.6 (2011).

Commissioner argued that the party-admission exception to the hearsay rule applied, that the portions of the report that he sought to be admitted were not a subsequent remedial measure, and that the report was relevant. The Commissioner then offered to introduce a redacted version of the report to include only the portion of the report entitled "basic causes." Specifically, the relevant portion of the report identified the following as one of the causes of the accident:

> Mr. Greer raised a load on the forklift higher than needed. Forks were elevated approximately 60 inches above ground level upon clearing pallets in the area, and at least 20 inches higher than needed. He did not then lower the load before traveling further, all contrary to his training.

Following the argument of counsel, the circuit court sustained the objection on the grounds that the report constituted a subsequent remedial measure:

> I have to say that I agree with Mr. Vance [counsel for UTMC]. I mean, this is just full of the assessment of the purported violations and incorrect measures that they are trying to correct. So I am going to sustain your objection, Mr. Vance.

The Commissioner thereafter sought to elicit Mr. Walsh's opinion on the causes of the accident. UTMC objected on the same grounds, and the circuit court sustained its objection. The Commissioner proffered that Mr. Walsh's expected testimony was that the elevation of the load created a visual hazard.

At the close of the Commissioner's evidence, UTMC made a motion to strike on the grounds that the Commissioner failed to prove the existence of a noncomplying condition. UTMC argued that the Commissioner was required to prove the existence of an obstruction which created an actual hazard. UTMC specifically argued that the Commissioner failed to present any evidence on the actual existence of a hazard caused by the presence of the pallets. The circuit court sustained the motion to strike on the grounds that "there was no violation."

On February 23, 2021, the circuit court entered a sketch order submitted by UTMC memorializing its ruling at trial. The written order reasoned that the federal administrative case law required the Commissioner prove that the obstructions created an actual hazard. In applying this interpretation, the circuit court ruled that the Commissioner failed to present any evidence on this fact. The circuit court focused exclusively on the causes of the accident and injury at issue. On March 24, 2021, the Commissioner filed his notice of appeal.

## ANALYSIS

The Commissioner alleges two assignments of error in the proceedings below. First, that the circuit court erroneously required proof of causation between an injury and a hazard when it sustained UTMC's motion to strike. Second, that the circuit court abused its discretion in excluding an investigative report and testimony from the investigator who generated the report.

### A. The Motion to Strike

The Commissioner appeals from the circuit court's ruling sustaining UTMC's motion to strike because the Commissioner failed to make a *prima facie* case for the existence of noncomplying conditions. The core of the Commissioner's argument is that the circuit court improperly required proof that the pallets created an actual hazard and/or an injury.

#### 1. The Standard of Review and Regulatory Scheme

The circuit court's legal interpretations of a regulation are questions of law which we review *de novo*. *See New Age Care, LLC v. Juran*, 71 Va. App. 407, 421 (2020).

The Code requires that the Commissioner file a civil action in circuit court when he receives written notice that a company contests a VOSH citation. Code § 40.1-49.4(E). Unlike the typical agency review process under the Virginia Administrative Process Act, the circuit court reviews the agency action *de novo*. *Atl. Env't Constr. Co. v. Malveaux*, 63 Va. App. 656, 660, 661 n.3 (2014). To prevail, the Commissioner must prove four elements: "(1) the

- 6 -

applicability of the standard, (2) the existence of noncomplying conditions, (3) employee exposure or access, and (4) that the employer knew or with the exercise of reasonable diligence could have known of the violative condition." *Nat'l Coll. of Bus. & Tech., Inc. v. Davenport*, 57 Va. App. 677, 685 (2011) (emphasis omitted). Accordingly, VOSH actions require a multi-layered analysis when weighing a motion to strike. In other words, in order to prove the existence of a noncomplying condition, the Commissioner must also prove all of the facts necessary to show the employer's noncompliance with a given regulation. Here, the circuit court ruled that the Commissioner made a *prima facie* case as to the first element—the applicability of the standard—but failed to prove the existence of noncomplying conditions. The circuit court did not reach the exposure or knowledge elements.

In this case, the parties dispute what the Commissioner must show to prove the existence of a noncomplying condition under 29 C.F.R. § 1910.176, as incorporated into Virginia law by 16 Va. Admin. Code § 25-90-1910. The Commissioner contends that the plain text of the regulation controls: that a noncomplying condition exists if there are (1) obstructions, (2) across or in aisles, (3) that *could* create a hazard. UTMC argues that several federal administrative law cases require the Commissioner prove that there are (1) obstructions, (2) across or in aisles, (3) that *actually* create a hazard.

There is no controlling case law on the meaning of the regulation at issue in this case. There are no Virginia cases interpreting this regulation, and there are no federal Article III court decisions interpreting this regulation. While the federal Occupational Safety and Health Review Commission ("OSHRC") has published cases and decisions involving this regulation, none speak directly to the meaning of the word "could" in the regulation. For the reasons that follow, we hold that the word "could" as used in the regulation only requires that the Commissioner prove that it was reasonably foreseeable that an obstruction could create a hazard.

When interpreting the meaning of a regulation under VAPA, we ordinarily give deference to an agency's interpretation of that regulation. *See Bd. of Supervisors v. State Bldg. Code Tech. Rev. Bd.*, 52 Va. App. 460, 466 (2008).[5] However, as noted, VOSH citations are not reviewed under VAPA, but instead under a specially designated procedure contained in Code § 40.1-49.4. Under this procedure, VOSH's citation decisions are reviewed *de novo* by the circuit court for "'findings of fact and conclusions of law, affirming, modifying or vacating [the Commissioner's] citation or proposed penalty, or directing other appropriate relief' deemed necessary by the court." *Atl. Envt'l Constr. Co.*, 63 Va. App. at 660 (quoting Code § 40.1-49.4(E)). The Code, therefore, does not direct courts to give any deference to the agency's interpretation.

Accordingly, courts should employ the traditional tools of statutory interpretation when interpreting VOSH safety standards. First, it is axiomatic that statutory interpretation must begin with the text itself to determine the intent of the legislature. *See Potter v. BFK, Inc.*, 300 Va. 177, 182 (2021). When determining that intent, words are "given their ordinary meaning, unless it is apparent that the legislative intent is otherwise." *Cox v. Commonwealth*, 73 Va. App. 339, 344 (2021) (quoting *Phelps v. Commonwealth*, 275 Va. 139, 142 (2008)). Where a word is not defined by the legislature, courts can look to dictionary definitions to supply the ordinary meaning of a word. *E.g.*, *Rose v. Commonwealth*, 53 Va. App. 505, 512 (2009) (applying dictionary definition of "use").

First, UTMC concedes that the Commissioner was not required to present evidence of an actual *harm* caused by the obstruction in the aisleway. The word "hazard" as used in the

---

[5] "This deference stems from Code § 2.2-4027, which requires that reviewing courts 'take due account' of the 'experience and specialized competence of the agency' promulgating the regulation." *Bd. of Supervisors*, 52 Va. App. at 466 (quoting *Va. Real Est. Bd. v. Clay*, 9 Va. App. 152, 160-61 (1989)).

regulation is not synonymous with the word "harm." "The term 'hazard' has been defined as 'a thing or condition that *might* operate against success or safety . . . a *possible* source of peril, danger, duress or difficulty.'" *Holtzman Oil Corp. v. Commonwealth*, 32 Va. App. 532, 544 (2000) (emphasis added) (quoting *Hazard*, *Webster's Third New International Dictionary* (1993)). In *Pelron Corp.*, 12 BNA OSHC 1833, at *4 (No. 83-388, 1986), the OSHRC defined a "hazard" as "practices, procedures or conditions which *increase* the likelihood" of harm. Accordingly, it is completely irrelevant in this case whether the pallets actually caused the accident that triggered the VOSH investigation. In other words, at a minimum, the parties agree that the regulation prohibits obstructions in aisleways that create an increased likelihood of harm.

However, the regulation not only prohibits obstructions that create a hazard, but also obstructions that *could* create a hazard. In this case, the word "could" is not defined in the regulation. Webster's Dictionary defines "could" as the past tense of the word "can," and defines the word "can" as meaning "may perhaps: may possibly," or, alternatively, "be inherently able or designed to."[6] Applying the plain meaning of the word "could" in the regulation therefore indicates that the regulation prohibits obstructions that possibly create hazards, subject to certain limitations.[7]

In other words, combining the definition of the word "hazard" and the word "could" leads us to conclude that the regulation prohibits obstructions in aisleways that "may possibly" create a "condition which increases the likelihood of harm." Accordingly, the regulation prohibits not only actual hazards, but what the OSHRC in *Pelron Corp.* called "potential

---

[6] *Could*, *Webster's Third New International Dictionary* (1993); *Can*, *Webster's Third New International Dictionary*, *supra*.

[7] As we explain further below, the regulation only prohibits obstructions which could create a *reasonably foreseeable* hazard in light of the facts and circumstances of a given workplace.

- 9 -

hazards." *See Pelron Corp.*, 12 BNA OSHC 1833, at *3 (defining a "potential hazard" as "the 'possibility' that a condition will occur"). Therefore, in this case, the noncomplying condition that the Commissioner was required to establish was an obstruction in an aisleway that created a potential hazard, not an actual hazard as the circuit court ruled.[8]

That said, the regulation's reach is not limitless. The regulation does not require employers to consider any and every condition which could conceivably increase the chances of harm. First, the test for a violation of a VOSH safety standard eschews strict liability and requires that the Commissioner prove actual or constructive knowledge by the employer. *Nat'l Coll. of Bus. & Tech., Inc.*, 57 Va. App. at 685. This Court has interpreted this element as precluding citations for violations "which are not generally foreseeable." *Atl. Env't Constr. Co.*, 63 Va. App. at 661. As the Virginia Supreme Court said in *Floyd Southern Pike Electrical Contractor, Inc. v. Commissioner*, 222 Va. 317 (1981) (per curiam), "[a]n employer . . . need not take steps to prevent hazards which are not generally foreseeable . . . but at the same time an employer must do all it feasibly can to prevent foreseeable hazards." *Id.* at 322-23 (quoting *Gen. Dynamics Corp. v. Occupational Safety & Health Rev. Comm'n*, 599 F.2d 453, 458 (1st Cir. 1979)). Accordingly, an employer cannot be held liable for a condition which is not reasonably foreseeable to create an increased risk of harm.

Second, the federal administrative case law makes clear that courts should consider the facts and circumstances of a given workplace to determine whether an obstruction creates a potential hazard. For example, in *Anchor Hocking Glass Co.*, 17 BNA OSHC 1644, at *3 (No. 94-0178, 1996) (ALJ), the administrative law judge found that the mere presence of an obstruction in an aisleway did not create a hazard "[u]nder the circumstances in [company's]

_____

[8] Of course, if the Commissioner established that the obstruction created an actual hazard, then he has necessarily established that the obstruction was a potential hazard.

location." In *Anchor Hocking Glass Co.*, the Secretary of Labor claimed that pallets in an aisleway prohibited the safe operation of multiple forklifts if there was pedestrian traffic at the same time. *Id.* The administrative law judge considered this potential hazard in light of the circumstances of the workplace including the "mammoth" size of the aisle, the specific traffic patterns and schedules established by the company for the forklifts, and training regarding the presence of the pallets. *Id.* In light of these circumstances, the pallets did not create a hazard. *Id.* Therefore, in order to prove the existence of a noncomplying condition under the regulation, the Commissioner must show that an obstruction in an aisleway is reasonably foreseeable to create a potential hazard in light of the facts and circumstances of a given workplace.

The federal administrative case law is consistent with interpreting the regulation as prohibiting potential hazards in addition to actual hazards. While none of the decisions are binding or directly on point, their reasoning is persuasive.

UTMC cites *Pelron Corp.*, 12 BNA OSHC 1833, in support of its argument that the regulation only prevents actual hazards, however, this case actually supports the opposite argument. In *Pelron Corp.*, the employer was cited for a violation of the OSHA general duty clause, not 29 C.F.R. § 1910.176(a). The general duty clause guarantees workers the right to work in an environment "free from recognized hazards." 29 U.S.C. § 654(a)(1). The OSHRC found that the general duty clause only prohibited actual hazards, not potential hazards. Notably, however, the general duty clause does not include the word "could," "can," or any other word of possibility. *See id.* Unlike the general duty clause, the regulation in this case *does* include a word of possibility and defining the regulation as prohibiting potential hazards would be consistent with the OSHRC's decision in *Pelron Corp.*

UTMC also cites *General Motors Co., Packard Electric Division*, 7 BNA OSHC 1205 (No. 78-1368, 1979) (ALJ) for the proposition that the word "could" should be excised from the

- 11 -

regulation. In *General Motors Co., Packard Electric Division*, the administrative law judge ruled that a twenty-two-inch intrusion into a ten-foot-wide aisleway did not create a hazard when the only vehicular traffic consisted of forty-inch-wide forklifts carrying forty-two-inch-wide loads. 7 BNA OSHC 1205, at *1. UTMC relies heavily on language from this ruling that notes that "only those obstructions which create a hazard are prohibited." *Id.* However, this ruling was issued in response to the Secretary of Labor's argument that *any* obstruction in an aisle constituted a violation of the regulation, an argument that the Commissioner does not make here. Indeed, the administrative law judge's ruling was inconsistent in its inclusion of the word "could." *E.g.*, *id.* at *2 ("Since the skid was not an obstruction which *could* create a hazard, there was no violation of 29 C.F.R. § 1910.176(a)." (emphasis added)). *General Motors Co., Packard Electric Division* stands for the proposition that not all obstructions can create hazards, not that an obstruction must create an actual hazard. *See also Anchor Hocking Glass Co.*, 17 BNA OSHC 1644 (relying on *Gen. Motors Co., Packard Elec. Div.*).[9]

Nonetheless, UTMC argues that reading "could" as meaning that the Commissioner need only present evidence of a reasonably foreseeable hazard as violating the canon against superfluity by rendering the phrase "could create a hazard" superfluous. Virginia courts "disfavor a construction of statutes that renders any part of the statute useless or superfluous."

---

[9] In fact, other federal administrative case law clearly shows that the OSHRC will consider potential hazards when interpreting this regulation. For example, in *Pharmasol Corp.*, 2018 CCH OSHD ¶ 33,692 (No. 16-1172, 2018), the OSHRC found a violation of the regulation despite the fact that the obstructions did not actually create hazards. The OSHRC considered reasonable hypothetical scenarios created by the obstructions in light of the actual practices of the company in finding a violation. *Id.* (finding that company's expert opinion that obstruction could not create a hazard was unpersuasive when it relied on the driving ability of the forklift operator and did not consider possible abilities of other operators); *Hughes Tool Co.*, 6 BNA OSHC 1366 (No. 15086, 1978) (same). The federal administrative case law supports the conclusion that the word "could" extends the reach of the regulation to reasonable potential hazards.

*Shoemaker v. Funkhouser*, 299 Va. 471, 487 (2021).  However, as noted above, the phrase "could create a hazard" operates as a vitally important limitation on the scope of the regulation, notwithstanding the plain meaning of the word "could."

Indeed, the interpretation proposed by UTMC would require this Court to treat the word "could" as superfluous, violating the canon against superfluity by requiring the Commissioner to show that an "obstruction across or in [an] aisle[] . . . create[d] a hazard."  This interpretation simply excises the word "could" from the regulation and would give it no meaning whatsoever. *See Shoemaker*, 299 Va. at 487.

UTMC also argues that applying the plain meaning of the word "could" will open the floodgates to employer liability by requiring courts to consider *any* conceivable hazard no matter how absurd or attenuated.  However, UTMC's argument not only neglects the "facts-and-circumstances" limitation found in the federal administrative case law and Virginia case law prohibiting only foreseeable hazards, but also the substantial procedural safeguards contained in the regulatory enforcement scheme that protect employers from liability from the most extreme interpretations of the plain meaning of the word "could."

For example, the regulations provide an employer with an affirmative defense.  16 Va. Admin. Code § 25-60-260(B) provides that a citation shall be vacated if an employer demonstrates that

> 1. Employees of such employer have been provided with the proper training and equipment to prevent such a violation;
>
> 2. Work rules designed to prevent such a violation have been established and adequately communicated to employees by such employer and have been effectively enforced when such a violation has been discovered;
>
> 3. The failure of employees to observe work rules led to the violation; and

- 13 -

4. Reasonable steps have been taken by such employer to discover any such violation.

Therefore, UTMC may avoid liability if it can show that it took appropriate steps to prevent violations.[10]

Finally, an employer's liability is limited by the statutory definition of a "serious violation." The most severe punishments under the regulatory scheme are limited to those violations that carry "substantial probability that death or serious physical harm could result." Code § 40.1-49.3. Therefore, employers do not face significant liability for technical violations of the regulations that do not pose serious risks to employee safety.

UTMC's concerns that a decision applying the plain meaning of the word "could" would open the floodgates to employer liability is unfounded. The Commissioner was only required to prove that it was foreseeable that the pallets created a potential hazard in light of the facts and circumstances of the case. He was not required to prove that the pallets caused a specific accident or injury, nor was he required to prove that the pallets created an actual hazard.

2. The Regulation as Applied in the Circuit Court

It is important to note that this case comes to us from the appeal of a grant of a motion to strike the evidence. With the case before us in that posture, it is irrelevant whether UTMC has a defense or whether the evidence is sufficiently credible or should be given sufficient weight for the Commissioner to ultimately prevail and we offer no opinion regarding the ultimate disposition of this case. The issue before us is only whether the Commissioner's evidence was sufficient to establish a regulatory violation when the evidence presented is considered in the light most favorable to him.

---

[10] Because this case comes before us on review of a motion to strike, whether UTMC will ultimately prevail on such a defense is not before us in this case.

- 14 -

Both parties agree that the Commissioner was not required to prove a causal connection between any injury and the alleged hazard. The regulation is wholly silent on injuries, accidents, or harms. While an injury could be relevant to proving the exposure or knowledge elements of the case (or the seriousness of the violation), the Commissioner does not need to show actual harm or injury to prove the existence of a noncomplying condition.

Here, the circuit court did not expressly rule that the Commissioner was required to prove a causal link between the injury and the alleged hazard. However, the circuit court's ruling focuses heavily on the cause of the accident that triggered the Commissioner's investigation. For example, the circuit court found that the Commissioner failed to present evidence that the forklift operator or the injured worker's visions were obstructed by the elevated load "at the time of the accident." The circuit court explained that "the testimony demonstrated that the accident occurred at least in part because the injured worker was not paying attention." Additionally, the circuit court clearly held that the regulation required the Commissioner to prove an actual hazard as opposed to a potential hazard.

We hold that the circuit court erred by requiring proof of an actual hazard instead of simply a reasonably foreseeable potential hazard. At first glance, the distinction between potential hazards and actual hazards appears to be a nebulous and vague one. The distinction is more clearly drawn by applying it to the facts of this case. Here, the Commissioner presented evidence that raising the forks in order for the forklift to clear the pallets created three potential hazards: a visual hazard, a "tip-over" hazard, and the risk that a collision would create a greater risk of injury.

To prove that the pallets created an *actual* visual hazard, the Commissioner would be required to present evidence that raising the forks actually obstructed the operator's vision. If the operator's vision was not actually obstructed by raising the forks, then doing so did not increase

- 15 -

the likelihood of harm and therefore did not create an actual hazard. However, to prove that the pallets created a *potential* hazard, the Commissioner simply needed to show that raising the forks *could have* obstructed the operator's vision—assuming that such a possibility was reasonably foreseeable in light of the facts and circumstances of the UTMC workplace. Mr. Farmer testified that the height of the load meant that the load itself or the mast of the forklift could have obstructed the forklift operator's vision.[11] This testimony is sufficient to survive a motion to strike.

Relatedly, to prove that the pallets created an *actual* "tip-over" hazard or a risk of greater injury, the Commissioner would have needed to present evidence that traveling with the forks raised increased the likelihood that the forklift would tip over or that an injury caused by a collision would be more significant. In fact, Mr. Farmer testified that travelling with an elevated load could have created a "tip-over" hazard or a risk of greater injury, facts which the circuit court ignored in its ruling.[12] It is irrelevant that no "tip over" happened in this case, and there is evidence that a collision occurred with a worker's head instead of his leg. Accordingly, the Commissioner presented evidence that travelling with the forks elevated created an actual hazard and the circuit court erred by disregarding that evidence on a motion to strike.

---

[11] UTMC argues on brief that the mast of a forklift is a stationary component of the machinery and that any visual obstruction risk created by the mast is present regardless of the heights of the forks. However, this fact was not presented to the circuit court and we cannot consider it on appeal.

[12] While Mr. Farmer's testimony is lacking detail as to the facts and circumstances necessary for an elevated load to create a "tip-over" hazard or a greater risk of injury, as noted above, this case is before us on a motion to strike and we only consider whether any rational fact finder could find for the Commissioner. *See Newton v. Veney*, 220 Va. 947, 951 (1980) (citing *Reagan v. Reagan*, 215 Va. 222, 224 (1974)).

### 3. Citation 1(b)

Finally, the Commissioner also argues that the circuit court erred because it did not consider evidence presented as to citation 1(b) regarding insufficiently marked aisles. The Commissioner clearly presented evidence that the aisle was not marked.

However, UTMC argues that the Commissioner has waived this argument by not expressly stating it in his assignments of error. Rule 5A:12(c)(1) requires that petitions for appeal "must list, clearly and concisely and without extraneous argument, the specific errors in the rulings below." This Court has held that Rule 5A:20(c)'s requirements that the opening brief contain the assignments of error imposes the same requirement on an appellant as Rule 5A:12(c)(1) imposes on a petitioner. *See Fox v. Fox*, 61 Va. App. 185, 202-03 (2012). The purpose of the assignment of error is "to 'point out the errors with reasonable certainty in order to direct [the] court and opposing counsel to the points on which [the] appellant intends to ask a reversal of the judgment, and to limit discussion to these points.'" *Carroll v. Commonwealth*, 280 Va. 641, 649 (2010) (first alteration in original) (quoting *Yeatts v. Murray*, 249 Va. 285, 290 (1995)). The Virginia Supreme Court has held that Rule 5A:12(c)(1) does not demand the inclusion of a "because clause" in an assignment of error. *Findlay v. Commonwealth*, 287 Va. 111, 116 (2014). Such a requirement would "create an unnecessary procedural trap that may bar appellate review of meritorious claims." *Id.*

Here, the Commissioner clearly identified his argument as to citation 1(b) to the circuit court below. In his assignment of error, he sufficiently identified the point on which he contends the circuit court erred: requiring the Commissioner to prove something that the regulation does

- 17 -

not require.[13]  Additionally, the Commissioner clearly identified this argument in his brief. UTMC was on notice as to the nature of the Commissioner's argument, and the Commissioner has complied with the requirement to "point out the errors with reasonable certainty."  *Carroll*, 280 Va. at 649 (quoting *Yeatts*, 249 Va. at 290).

Accordingly, the circuit court also erred by requiring proof of an injury or actual hazard because the regulation provides an alternative noncomplying condition on which the Commissioner presented evidence.  *See* 29 C.F.R. § 1910.176(a) ("Permanent aisles and passageways shall be appropriately marked.").

## B.  The Evidentiary Ruling

In his second assignment of error, the Commissioner argues that the circuit court erred by sustaining UTMC's objections to the introduction of a post-accident investigative report prepared by UTMC.  Separately, but relatedly, the Commissioner also argues that the circuit court erred by sustaining UTMC's objections to follow-up questions to the report's author.

Appellate courts review a circuit court's ruling on the admissibility of evidence under an abuse of discretion standard.  *Thomas v. Commonwealth*, 279 Va. 131, 168 (2010).  A court always abuses its discretion when it makes an error of law.  *See, e.g.*, *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020).  A court can also abuse its discretion in three other ways:  (1) by failing to consider a relevant factor that should have been given significant weight, (2) by considering and giving significant weight to an irrelevant or improper factor, and (3) by committing a clear error of judgment, even while weighing "all proper factors."  *Lawlor v.*

---

[13] Specifically, the Commissioner's assignment of error claims that "The circuit court erred by misinterpreting the Regulation to require proof of causation between an injury and the alleged hazard – obstructed aisleways – and by discounting evidence of an actual hazard that likely caused this injury."

- 18 -

*Commonwealth*, 285 Va. 187, 213 (2013) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

Virginia Rule of Evidence 2:407, derived from Code § 8.01-418.1, provides that:

> When, after the occurrence of an event, measures are taken which, if taken prior to the event, would have made the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct as a cause of the occurrence of the event; provided that evidence of subsequent measures is not required to be excluded when offered for another purpose for which it may be admissible, including, but not limited to, proof of ownership, control, feasibility of precautionary measures if controverted, or for impeachment.

Therefore, when faced with such questions, courts must consider two questions: is the evidence offered actually a remedial measure, *i.e.* a measure which "if taken prior to [an] event, would have made the event less likely to occur"; and, second, whether the evidence is offered to prove negligence or culpable conduct as a cause of the event.

We deal first with the purpose element. The inferential process that the rule prohibits is that the defendant, by remedying a given situation, has admitted by his conduct that the situation was dangerous or illegal, or that he was otherwise at fault for causing that situation. *See* Fed. R. Evid. 407 advisory committee's note to 1972 proposed rule.[14] The rationale behind this rule is two-fold. First, this inference is weak in any event. There are myriad other explanations for why a defendant would change a condition other than as an admission of fault by conduct. *Id.* Second, and more importantly, the law should not discourage potential defendants from making working conditions within their control safer for fear that such a remedial measure will later be used against them to prove their culpability. *See Turner v. Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 253 (1975).

---

[14] While there are some stylistic differences between Federal Rule of Evidence 407 and Rule 2:407, we find the rationales behind the rules to be similar.

- 19 -

In this case, the situation or "event" in question is the existence of a noncomplying condition under the VOSH standards. Accordingly, the inferential process that the rule prohibits in this case is that the Commissioner may not rely on any action taken by UTMC that would make the presence of an obstruction that could create a hazard less likely to occur, if that action is offered to prove that UTMC's negligence or culpable conduct caused the presence of an obstruction that could create a hazard.

We note that this is not a torts case. Negligence is not an element of the Commissioner's claim. As such, the report could not have been offered to prove that UTMC's negligence caused the existence of a noncomplying condition. The question then becomes whether the evidence was offered to prove UTMC's culpable conduct as a cause of the existence of a noncomplying condition.[15]

In *Werner v. Upjohn Co., Inc.*, 628 F.2d 848 (4th Cir. 1980), the Fourth Circuit interpreted "culpable conduct" as used in the federal analogue to Rule 2:407 as conduct which is "blamable; censurable; involving the breach of a legal duty or the commission of a fault. . . . [I]t implies that the act or conduct spoken of is reprehensible or wrong, but not that it involves malice or a guilty purpose." *Id.* at 856-57 (quoting *Black's Law Dictionary* (4th ed. 1968)).

The *Werner* court interpreted the phrase "culpable conduct" in the context of a strict products liability case where, as is the case here, negligence is not an element of the claim. There, the plaintiff argued that Rule 407 did not apply in such a situation because the inquiry only focused on the dangerousness of the product, not the bad actions of the defendant. *Id.* at 856. The *Werner* court disagreed, reasoning that, "[f]rom a defendant's point of view it is the fact that the evidence may be used against him which will inhibit subsequent repairs or

---

[15] The phrase "culpable conduct" is not defined in the Rule or in the statute, and there are no Virginia cases interpreting the phrase in the context of Rule 2:407.

improvement. It makes no difference to the defendant on what theory the evidence is admitted; his inclination to make subsequent improvements will be similarly repressed." *Id.* at 857.[16]

Based on the policy purposes behind the rule and the *Werner* court's persuasive reasoning on its application to strict liability cases, we find that Rule 2:407 applies in an action to enforce a citation for violations of the VOSH safety regulations. The goal of Rule 2:407 is to encourage potential defendants to make improvements to prevent injuries. This goal would be thwarted by refusing to apply Rule 2:407 in VOSH safety regulation cases.[17]

Having found that Rule 2:407 applies to VOSH safety regulations cases, we turn to whether the investigative report generated by UTMC can fairly be considered a subsequent remedial measure within the meaning of the rule. There are no reported Virginia cases determining whether a party's subsequent identification of the cause of an accident constitutes a subsequent remedial measure. However, other jurisdictions have interpreted their analogues to Rule 2:407 and their analyses are instructive.

The majority of courts hold that investigative reports, by their very nature, cannot be subsequent *remedial* measures. As the Tenth Circuit has noted "such [reports] are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the [report]." *Rocky Mountain Helicopters, Inc. v. Bell Helicopters*, 805 F.2d 907, 918 (10th Cir.

---

[16] *See also Bauman v. Volkswagenwerk Aktiengesellschaft*, 621 F.2d 230, 232 (6th Cir. 1980); *Flaminio v. Honda Motor Co., Ltd.*, 733 F.2d 463, 469 (7th Cir. 1984); *Gauthier v. AMF, Inc.*, 788 F.2d 634, 636-37 (9th Cir.), *amended on denial of reh'g*, 805 F.2d 337 (9th Cir. 1986); Fed. R. Evid. 407 advisory committee's note to 1997 amendments.

[17] We note also that the OSHRC has applied the federal rule in its proceedings with little controversy. *See, e.g.*, *Houston Sys. Manuf. Co.*, 1978 CCH OSHD ¶ 23,024 (No. 77-2117, 1978); *Gen. Dynamics Corp., Elec. Boat Div.*, 1980 CCH OSHD ¶ 24,892 (No. 79-6844, 1980).

1986).[18]  These courts reason that post-accident investigations cannot logically be measures that would make an event less likely to occur because one cannot identify the cause of an event before it happens.  However, these reports do occasionally include recommendations for how to prevent accidents happening in the future.  When investigative reports do include recommendations for subsequent remedial measures, most of these courts agree that simply redacting any mention of the remedial recommendations from the version of the report ultimately admitted is an appropriate compromise.  *See, e.g.*, *City of Bethel v. Peters*, 97 P.3d 822, 827 (Alaska 2004).

Other courts have held that the policy purposes behind the rule prohibit the introduction of these investigative reports in their entirety.  In *Martel v. Massachusetts Bay Transportation Authority*, 525 N.E.2d 662, 664 (Mass. 1988), the Massachusetts Supreme Judicial Court

---

[18] Other jurisdictions have adopted the reasoning of the Tenth Circuit.  *See, e.g.*, *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 431 (5th Cir. 2006) (declining to extend Rule 407 to investigations "which by themselves do not make the accident less likely to occur"); *Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 33 (1st Cir. 1988) (holding that report at issue was "'internal investigatory report' of the sort not protected by Rule 407"); *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 932 (E.D. Wis. 2017) (holding that the investigation leading to the remedial act of employee discipline did not fall within scope of Rule 407); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1103 (D. Or. 2013); ("By it [sic] terms, [Rule 407] is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what *did* occur."); *Bullock v. BNSF Ry. Co.*, 399 P.3d 148, 158 (Kan. 2017) ("[I]t is not unusual for some evidence to include information that is permissible, such as investigative conclusions, and information that is impermissible, such as [the recommended remedial measure of] employee discipline."); *City of Bethel v. Peters*, 97 P.3d 822, 827 (Alaska 2004) (holding that post-incident report, with "corrective action" section redacted, was admissible); *Fox v. Kramer*, 994 P.2d 343, 352 (Cal. 2000) (noting that the majority of courts "distinguish between an investigation and actual steps taken to correct a problem; post[-]event investigations do not themselves constitute remedial measures, although they might provide the basis for such measures"); *J.B. Hunt Transp., Inc. v. Guardianship of Zak*, 58 N.E.3d 956, 966 (Ind. Ct. App. 2016) ("The majority of jurisdictions agree that a post-incident investigation and report of the investigation do not constitute inadmissible subsequent remedial measures.").

explained that while such reports are not themselves remedial, they are a necessary prerequisite to any remedial safety measures.

Finally, in a recent case, *Thomas v. University Medical Center, Inc.*, 620 S.W.3d 576 (Ky. 2020), the Kentucky Supreme Court announced a third approach. Under the Kentucky approach, a court should consider whether a defendant has actually adopted any of the remedial measures contained in the investigative report. *Id.* at 586. If so, the *Thomas* court reasons, the report merges with the measures and the policy purposes of the rule are best served by total exclusion. *Id.* However, where any measures recommended by a report are not implemented, the "information alone would not have made the incident less likely to occur." *Id.* Accordingly, the Kentucky test constitutes a case-by-case approach wherein trial courts must determine whether any remedial actions recommended by an investigative report were actually implemented by the defendant. *Id.* at 587. If so, then the entirety of the report is excluded from evidence. *Id.* If the recommendations are not taken, then the court should admit the document in its entirety. *Id.*

We think the majority rule—admitting investigative reports with redactions for remedial measures recommended—is the best approach. While we find many aspects of the Kentucky approach attractive, it presents several pitfalls that give us pause. First, it has the consequence of excluding more evidence than the rule explicitly allows. Rule 2:407 only excludes measures which "if taken prior to [an] event, would have made the event less likely to occur." Significantly, the rule is derived from the Virginia Code, and it is a long-standing rule of statutory construction that we may not add language to statutes. *Berglund Chevrolet, Inc. v. Va. Dep't of Motor Vehicles*, 71 Va. App. 747, 754 (2020). The rule and statute only reach specific conduct (measures that would make an event less likely to occur) and do not permit potential

- 23 -

defendants to immunize incriminating evidence by including it in a report that also happens to recommend remedial measures.

Additionally, the Kentucky rule could prove difficult to implement in marginal cases. Should entire reports be inadmissible if only one minor recommendation is adopted? What if a recommendation is adopted in part or in a modified manner? What if remedial changes were made following an accident but prior to or contemporaneous with a report? When do a report's recommendations become stale? The Kentucky rule provides more questions than answers.

Accordingly, we hold that the mere identification of the causes of an event are not subsequent remedial measures within the meaning of Rule 2:407. Where such a report includes a recommendation for a remedial measure or evidence of an actual remedial measure taken, such inclusions should be redacted or otherwise excised from the report ultimately admitted into evidence.

Applying this holding to the facts of this case, the fact that UTMC investigated the worksite accident and generated a report as to its causes is not a measure "which if taken prior to the event would have made the event less likely to occur." Had the Commissioner sought to introduce evidence of some subsequent physical change UTMC made to the worksite (such as moving the pallets), that evidence would have been inadmissible as a subsequent remedial measure, but UTMC's identification of a cause of the accident is admissible. Accordingly, the circuit court made an error of law and abused its discretion by classifying UTMC's identification of the causes of the accident as a subsequent remedial measure. To the extent to which the report contained recommendations for how to prevent such accidents in the future, the circuit court did not err as those recommendations should have been redacted from the version of the report ultimately admitted.

UTMC argues that even if the circuit court erred by excluding the report as a subsequent remedial measure, this Court should affirm as the report was inadmissible hearsay. We disagree. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See* Va. R. Evid. 2:801. Hearsay is inadmissible unless it falls within one of the exceptions to the hearsay rule. Va. R. Evid. 2:802. Among these exceptions is the party admissions exception. Va. R. Evid. 2:803(0). Under that exception

> A statement offered against a party that is (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or employee, made during the term of the agency or employment, concerning a matter within the scope of such agency or employment, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

*Id.*

The report is undeniably hearsay; however, it is also undeniably a party admission. Mr. Walsh was an employee of UTMC who generated the report during the term of his employment, concerning a matter within the scope of his employment as safety manager. *See* Va. R. Evid. 2:803(0)(D). Furthermore, Mr. Walsh was present at trial as the corporate representative of UTMC. *See* Va. R. Evid. 2:803(0)(A). Mr. Walsh's statements qualify as a party admission under two separate theories, and the circuit court could not have excluded the report on hearsay grounds.

UTMC additionally argues, however, that any error by the circuit court in excluding the report and the Commissioner's follow-up questions was harmless because the report and follow-up questions would not have revealed relevant evidence. *See Commonwealth v. White*, 293 Va. 411, 420-21 (2017). An error is harmless if "the error did not influence the [factfinder],

or had but slight effect." *Commonwealth v. Swann*, 290 Va. 194, 201 (2015) (per curiam) (quoting *Anderson v. Commonwealth*, 282 Va. 457, 467 (2011)). Evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401.

The section of the report that the Commissioner sought to introduce meets this low threshold. Although much of the Commissioner's evidence irrelevantly focused on the causes of the accident that triggered the compliance investigation, the cause of the accident itself was not an element of the Commissioner's claim. Instead, the "fact in issue" in this case was whether the pallets caused an obstruction that could have created a hazard. Accordingly, the relevance question becomes whether the fact that UTMC identified the elevation of the load as a cause of the accident made it more probable that the pallets could have created a hazard. Based on the Commissioner's proffer of Mr. Walsh's expected testimony in response to the Commissioner's follow-up questions (that the elevated load caused the accident because it obstructed the operator's vision), we find that the report in redacted form and questions were relevant, and the circuit court's error was not harmless.

CONCLUSION

Because the circuit court erred by requiring the Commissioner to prove that the pallets created an actual hazard, and because the circuit court abused its discretion by excluding a post-accident investigative report generated by UTMC, we reverse the judgment of the circuit court in sustaining UTMC's motion to strike the evidence and in refusing to admit a redacted version of UTMC's report on the accident and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*